**Christina CARDONA, Plaintiff,**

v.

**Officer Timothy M. CONNOLLY, Defendant.**

**No. 3:03CV1838 (DJS).**

United States District Court, D. Connecticut.

March 28, 2005.

John R. Williams, Williams & Pattis, New Haven, CT, for Plaintiff.

Daniel C. Demerchant, Magdalena P. Capasso, Howd & Ludorf, Hartford, CT, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SQUATRITO, District Judge.

On August 27, 2003, plaintiff Christina Cardona ("Cardona") brought this action for damages against defendant Timothy Connolly ("Connolly") pursuant to 42 U.S.C. §§ 1983 and 1988, claiming violations of her rights under the Fourth Amendment of the United States Constitution, and, pursuant to Section 22–357 of the Connecticut General Statutes, claiming a violation of Connecticut's dog bite statute. Now pending is defendant's motion for summary judgment (dkt. # 16) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated herein, defendant's motion (dkt. # 16) is **GRANTED.**

## I. FACTS

On March 9, 2003, in the early hours of the morning, plaintiff Christina Cardona was riding as a passenger in a Plymouth Neon ("Neon") in Meriden, CT. Cardona, along with the Neon's driver, Carlos Rohena ("Rohena") and another passenger, Albert Cuevas ("Cuevas"), was returning from a party at which she had consumed alcoholic beverages. Neither Rohena nor Cuevas is a party to this case. Defendant Timothy Connolly, who is a police officer with the Meriden Police Department, was on routine patrol duty that day. Connolly was accompanied by his police canine, Kemo ("Kemo").

At approximately 2:00 a.m. on the day in question, Connolly observed the Neon driving down a street in Meriden. He decided to stop the Neon for an alleged traffic violation. Connolly pulled his police cruiser behind the Neon and turned on the cruiser's lights and siren. The Neon pulled into a parking lot and stopped. However, before Connolly could approach the Neon to assess the situation, Rohena and Cuevas exited the vehicle and fled by foot. Connolly ordered Rohena and Cuevas to stop, but neither obeyed. Connolly then ordered Kemo to pursue Rohena and Cuevas. Shortly thereafter, though, Connolly ordered Kemo to return. Kemo, not having captured either Rohena or Cuevas, went back into the police cruiser.

As he approached the Neon, Connolly saw that Cardona was still sitting in the car. He observed that there was an alcoholic beverage on Cardona's lap. Connolly then told Cardona to get out of the Neon, and Cardona obeyed. Connolly then handcuffed Cardona and told her that she was not under arrest at that time, but that he was placing her in handcuffs "for safety purposes only."

While he was communicating on his portable police radio, Connolly led Cardona towards the police cruiser. At some point, Kemo, apparently without instructions from Connolly, had exited the police cruiser through the back passenger door, which was left open. Neither Connolly nor Cardona had seen Kemo exit the police cruiser. While Connolly and Cardona were standing near the cruiser, Kemo came up to Cardona and bit her on the leg. Connolly, seeing the attack, ordered Kemo

to go back into the cruiser, and Kemo, immediately releasing his bite, retreated into the cruiser.

Connolly then summoned an ambulance for Cardona, who was still handcuffed. Cardona was taken to Midstate Medical Center ("Midstate") in Meriden, where her leg was cleaned and bandaged around the area of the bite. After her visit to Midstate, Cardona visited her primary care physician, Dr. Paranik ("Paranik"), to see if Cardona needed plastic surgery for the scars caused by the bite. Paranik told Cardona to wait a year to see if the scarring would heal.

Cardona claims that, as a result of this incident, she has permanent scarring on her leg. She also says that she experiences soreness and pain in her leg when she performs certain types of movement. This incident caused Cardona to miss two weeks of work at her job and a month of classes at her college. In addition, Cardona states that she is now afraid of big dogs.

## II. DISCUSSION

Cardona alleges that Connolly's actions violated her Fourth and Fourteenth Amendment rights. Cardona also alleges that Connolly's conduct violated Section 22–357 of the Connecticut General Statutes. Connolly moved for summary judgment with respect to all counts of the complaint. Connolly claims that Cardona failed to establish violations of her constitutional rights and that he has governmental immunity for the state claim. Connolly alternatively raises the affirmative defense of qualified immunity for the federal claims.

### A. STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *American Int'l Group, Inc. v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. FOURTH AMENDMENT

#### 1. The Seizure

Cardona claims that her seizure and Connolly's use of handcuffs were violations of her Fourth Amendment rights. Connolly asserts that neither the seizure nor the use of handcuffs were a Fourth Amendment violation. Connolly alternatively asserts that, even if the court were

to find constitutional violations, he is protected from liability by qualified immunity.

### a. Traffic stop and ordering Cardona to exit the vehicle

■ The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Supreme Court has held that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment's] provision." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Id.* at 810, 116 S.Ct. 1769.

■ Connolly's decision to stop the Neon in which Cardona was a passenger was reasonable under the Fourth Amendment. Connolly claims that the Neon was traveling at a high rate of speed, skidded, and ran through a street intersection in violation of a red overhead traffic light. There are questions as to whether the Neon was traveling at a high rate of speed and as to whether the Neon skidded. Based on Connolly's assertions and Cardona's testimony, however, Connolly could have reasonably believed that the Neon did violate the traffic laws by running through a red light. Cardona's testimony supports Connolly's claim:

Q. And where was Officer Connolly's patrol vehicle in relation to where you were on Center Street?

A. He was on the left of us.

Q. At an intersection?

A. Yes.

Q. Was he stopped for an overhead traffic control signal; do you know?

A. Yes.

Q. Tell me what happened next.

A. He was at a red light and we were driving down and the light was yellow, *must have been turning red and we went through.*

Q. Would that be your light that was turning yellow and then red?

A. Yes.

(Cardona Dep. at 33:25–34:14) (emphasis added). Based on this testimony, the court finds that Connolly had reason to believe that there was a violation of the traffic laws. *See* Conn. Gen.Stat. § 14–299(b)(3) ("Red alone: Vehicular traffic facing a steady red signal alone shall stop before entering the crosswalk on the near side of the intersection. . . .").

Connolly's reasonable belief that a traffic law had been violated gave rise to probable cause to stop the Neon. "Probable cause arises when the police reasonably believe that 'an offense has been or is being committed.'" *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.1994) (quoting *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir.1987)). "When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle." *Id.* at 782 (quoting *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir. 1990)). Based on his reasonable belief that a traffic offense had been committed, Connolly's traffic stop was reasonable under the Fourth Amendment.

Next, the court must determine whether Connolly's decision to take Cardona out of the Neon was reasonable under the Fourth Amendment. Connolly never had the chance to talk to the driver, Rohena, because Rohena, along with the other pas-

senger, Cuevas, ran from the scene before Connolly could talk to him. After Rohena and Cuevas fled the scene, Connolly observed that Cardona was sitting in the Neon with an alcoholic beverage on her lap. He then told Cardona to exit the Neon.

■ "[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Maryland v. Wilson*, 519 U.S. 408, 415, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997). In addition, an officer who makes a traffic stop "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). As noted above, Connolly had lawfully stopped the Neon. The driver and a passenger had fled the scene. Cardona was sitting in the Neon with a bottle of an alcoholic beverage. Therefore, Connolly was permitted to order Cardona to get out of the vehicle and, at a minimum, ask her questions so that he could gather information.

b. Connolly's use of handcuffs during the traffic stop

The court must next determine whether Connolly's subsequent handcuffing of Cardona went beyond the scope of a justifiable seizure. There is no question that Connolly "seized" Cardona by handcuffing her. However, the issue here is not to determine the existence of a seizure, but to determine "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Terry v. Ohio*, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Cardona claims that, even if Connolly had a basis for questioning her (which, as the court explained above, he did), Connolly had no justification to use handcuffs on her or to take her over to the police cruiser. Cardona asserts that Connolly's conduct exceeded the limits of an investigatory, or *Terry*, stop and became, in fact, an unlawful arrest.

■ "The right not to be arrested in the absence of probable cause is undoubtedly well-established." *Oliveira v. Mayer*, 23 F.3d 642 (2d Cir.1994). Still, "[a]n officer may, consistent with the Fourth Amendment, briefly detain an individual 'if the officer has a reasonable suspicion that criminal activity may be afoot.'" *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir.2004) (quoting *United States v. Colon*, 250 F.3d 130, 134 (2d Cir.2001)). "A routine traffic stop ... is a relatively brief encounter and 'is more analogous to a so-called "*Terry* stop" ... than to a formal arrest.'" *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (quoting *Berkemer*, 468 U.S. at 439, 104 S.Ct. 3138).

In order to decide if a seizure is reasonable, the court must determine "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. In justifying an intrusion upon constitutionally protected interests, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. These facts must be "judged against an objective standard: would the facts available to the officer at the moment of seizure ... 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.* at 21–22, 88 S.Ct. 1868.

■ In determining whether a investigatory stop is intrusive enough to be a *de facto* arrest,

the Second Circuit considers the "amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used." *Id.* (quoting *United States v. Perea*, 986 F.2d 633, 645 (2d Cir.1993)). The presence of one of these factors standing alone, though, does not necessarily convert a *Terry* stop into a *de facto* arrest. *Oliveira*, 23 F.3d at 646. As the Second Circuit has noted, "although '[u]nder ordinary circumstances, ... using handcuffs [is] not part of a *Terry* stop[,] intrusive and aggressive police conduct' is not an arrest 'when it is a reasonable response to legitimate safety concerns on the part of the investigating officers.' " *Vargas*, 369 F.3d at 102 (quoting *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir.2001)). Therefore, in order to determine whether Connolly's conduct was "reasonable" for this investigative stop or whether it constituted an unlawful arrest, the court must analyze the pertinent facts in light of the standards set forth in *Terry* and its progeny.

■ Connolly's conduct was not unreasonably intrusive enough to violate the Fourth Amendment. As the Supreme Court has stated, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23, 88 S.Ct. 1868. Connolly had probable cause to pull over the Neon, and he was permitted to order Cardona out of the car. If this had been a simple traffic stop, with no other surrounding circumstances involved, then handcuffing Cardona may have been unreasonable because handcuffs are not ordinarily used during *Terry* stops. Connolly, however, faced more than a simple traffic stop. Immediately after Connolly pulled over the car, Rohena and Cuevas exited the vehicle and fled. Connolly saw Cardona, who was 19 years old at the time, sitting in car with a bottle of alcohol. Because Connolly had not yet searched Cardona's person, he would not have known if she was armed. Connolly did not know whether Rohena or Cuevas would return, or whether they were armed. Furthermore, Connolly had no backup support on the scene, and this incident took place at approximately 2:00 a.m.

"The test is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *United States v. Walker*, 7 F.3d 26, 29 (2d Cir. 1993). "In determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868. Connolly's detainment of Cardona was based on more than an inchoate and unparticularized hunch that something was amiss. Two suspects had fled during a traffic stop, and Connolly did not know where they had gone or if they would return. Connolly did not know if Cardona was armed. Connolly did not know whether Cardona, by having an alcoholic beverage in an automobile operating on a public road, had violated the law. The stop occurred at night. These factors were sufficient to give Connolly a reasonable suspicion that criminal activity may be afoot, and that his own safety might be at risk.

Based on the facts presented, it was reasonable for Connolly to handcuff Cardona and lead her to the police cruiser while he was calling for backup. Connolly could detain Cardona for a reasonable

amount of time until he determined the situation and ensured his safety. Indeed, Connolly told Cardona his reasons for handcuffing her. Although the articulation of these reasons did not automatically render Connolly's conduct reasonable, it did, at least, indicate that Connolly was safeguarding himself and not placing Cardona under arrest:

Q. Did the officer say anything to you before he handcuffed you?

A. He told me that he was gonna cuff me just for safety purposes only.

. . . .

Q. Did you hear the officer say anything else when he cuffed you other than he was cuffing you for safety purposes?

A. No.

Q. Did he inform you that you were not under arrest?

A. Yes.

Q. So he did say also that you were not under arrest?

A. Yes.

Q. Did he say that you were not under arrest at that time?

A. Yes.

(Cardona Dep. at 73:3–6; 74:16–75:2).

Based on the facts of this case, it was reasonable for Connolly to handcuff Cardona and lead her to the police cruiser, and Connolly's actions did not constitute an unlawful arrest. Therefore, the court finds that there was no violation of Cardona's Fourth Amendment rights on this issue, and Connolly's motion for summary judgment on this claim is **granted.**

---

**1.** "Police dogs serve important law enforcement functions . . . , and their use is not inherently dangerous." *Kuha v. City of Minnetonka,* 365 F.3d 590, 600 (8th Cir.2003) (citation omitted). Because police dogs are law en-

### 2. The Dog Bite

Cardona asserts that a bite from a police dog makes her a victim of unreasonable force. That is, Cardona claims that her Fourth Amendment right to be free from unreasonable seizures was violated because Connolly failed to properly restrain the dog that bit her. Connolly counters Cardona's claims by asserting that the dog bite was not a violation of Cardona's constitutional rights because the bite was not a result of Connolly's deliberate act.

■ "[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham,* 490 U.S. at 395, 109 S.Ct. 1865. Here, however, the dog bite[1] occurred after Connolly had placed Cardona in handcuffs. That is, Connolly had already reasonably seized Cardona when the dog attacked. Therefore, although Cardona claims that the dog bite was "unreasonable" under the Fourth Amendment, the court must first determine whether the dog bite was, in fact, a seizure at all. If the dog attack was not a seizure under the Fourth Amendment, then, *a fortiori,* the attack could not be "unreasonable."

A seizure requires an intentional act by the party effecting the seizure. The Supreme Court has stated the following in this respect:

[A] Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement . . ., nor even

---

forcement tools, the court can analyze an attack from a police dog in a similar manner to an officer's use of any other law enforcement tool, such as a gun or a nightstick.

whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement ..., but only when there is a governmental termination of freedom of movement *through means intentionally applied.*

*Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989). Also,

[a] [v]iolation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act.

*Medeiros v. O'Connell,* 150 F.3d 164, 167 (2d Cir.1998) (quoting *Brower,* 489 U.S. at 596, 109 S.Ct. 1378); *cf. Dodd v. City of Norwich,* 827 F.2d 1, 7–8 (2d Cir.1987) (on reargument) (holding that an unintentional shooting of a burglary suspect by a police officer while the officer was handcuffing the suspect did not rise to a Fourth Amendment violation because "[i]t makes little sense to apply a standard of reasonableness to an accident.... The fourth amendment ... only protects ... against 'unreasonable' seizures, not seizures conducted in a 'negligent' manner."). A Fourth Amendment seizure occurs when a person has been "stopped *by the very instrumentality set in motion or put in place in order to achieve that result.*" *Brower,* 489 U.S. at 599, 109 S.Ct. 1378 (emphasis added).

Cardona has not shown that the dog bite was the result of Connolly's intentional act. Although Connolly had seized Cardona through the use of handcuffs, there is no indication that Connolly intended for Kemo to bite Cardona. That is, Connolly never meant to use this particular "instrumentality" (*i.e.,* Kemo) in order to effect Cardona's seizure. There is no evidence that Connolly gave Kemo an order to attack Cardona, nor is there evidence that Connolly actually saw Kemo approach Cardona. In fact, Cardona admitted in her deposition that she did not hear Connolly order the attack and that she did not know if Connolly saw the dog's approach:

Q. Now–but you didn't see the dog get out of the back seat; is that correct?

A. Correct

Q. Do you know if the officer saw the dog before the dog actually bit you?

A. No, I don't.

Q. Did you hear the officer give any commands to the dog at any time after he escorted you over to where you were bit but before you were bit?

A. Before I was bit? No.

(Cardona Dep. at 53:5–14). Cardona has presented no other evidence to demonstrate that Connolly ordered the attack or saw the dog approach Cardona.

Cardona cites to authority holding that police dog bites can be "unreasonable" seizures under the Fourth Amendment. *See Priester v. City of Riviera Beach,* 208 F.3d 919 (11th Cir.2000); *Watkins v. City of Oakland,* 145 F.3d 1087 (9th Cir.1998); *Vathekan v. Prince George's Co.,* 154 F.3d 173 (4th Cir.1998). These cases discuss another type of claim. In *Vathekan,* an officer released a police dog into a building to find and apprehend a burglary suspect, and the dog bit a third party. *Vathekan,* 154 F.3d at 175–77 (finding that question of fact remained as to whether the officer gave the required notice that he was sending the dog into the building, the court denied the officer's motion for summary judgment). *Priester* also involved a police dog that was commanded to attack a burglary suspect. In *Watkins,* an officer re-

leased a dog to search for and apprehend a burglary suspect. *Watkins*, 145 F.3d at 1090. The dog found and bit the suspect, but the officer did not call off the dog. *Id.* Instead, the officer ordered the suspect to show his hands. *Id.* The suspect, who was recoiling from the dog's bite, failed to comply. *Id.* The officer then pulled the suspect onto the ground, and the dog continued to bite until the suspect complied with the officer's orders to show his hands. *Id.* The Ninth Circuit denied the officer's motion for summary judgment, saying that "it [is] clearly established that excessive duration of the bite and improper encouragement of a continuation of the attack by officers could constitute excessive force that would be a constitutional violation." *Id.* at 1093.

None of these cases dictate the result here because they all involve officers who ordered the police dogs to attack. The officers in *Vathekan*, *Priester*, and *Watkins* intentionally used their police dogs to bring about seizures. The dogs in those cases were the intended instrumentalities through which the police officers effectuated the seizures of their suspects. Here, on the other hand, there is no evidence that Connolly ordered Kemo to bite Cardona. Cardona has not shown that Connolly knew of or saw the dog's attack, nor has she demonstrated that the dog held onto her leg for an "excessive duration" or that Connolly gave the dog any "improper encouragement." In fact, Cardona's own testimony indicates that, as soon as Connolly became aware of Kemo's conduct, he acted swiftly in stopping Kemo's attack:

Q. Did he [Kemo] bite [your leg] and hold on?

A. He bit enough to puncture it.

Q. And how long of a bite?

A. I don't remember. It wasn't that long.

. . . .

Q. What happened when the officer [Connolly] became aware that the dog was biting you?

A. He commanded the dog to go back into the car.

. . . .

Q. When the dog-when the officer commanded the dog to get back into the car, what happened?

A. The dog released my leg and went back into the car and the officer closed the door.

Q. Did the officer give a command to the dog immediately upon noticing that it was biting you?

A. Yes.

Q. And the dog immediately released the bite?

A. Yes.

(Cardona. Dep. at 54:21–24; 55:4–6; 55:11–19). Indeed, in a similar case involving an unintentional attack by a police dog, one district court found there to be no Fourth Amendment seizure. *See Andrade v. City of Burlingame*, 847 F.Supp. 760, 763–65 (N.D.Cal.1994), *aff'd sub nom. Marquez v. Andrade*, 79 F.3d 1153 (9th Cir.1996) (no Fourth Amendment violation occurred when, after the officer had already seized the plaintiffs, a police dog escaped from patrol car and bit the plaintiffs, because the officer did not intentionally use the police dog to effectuate the seizure).

Accordingly, the court finds that dog bite did not constitute Fourth Amendment seizure because Connolly did not intentionally use the police canine to bring about such a seizure. Without a Fourth Amendment seizure, Cardona's claim that the dog bite was an "unreasonable" seizure under the Fourth Amendment certainly cannot stand. Connolly's motion for summary judgment with respect to this claim is **granted.**

## C. STATE LAW CLAIM

 Because Cardona's federal claims have been disposed of in summary judgment, Cardona's only remaining claim is that Connolly violated Conn. Gen.Stat. § 22–357 ("the dog bite statute"). "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Castellano v. Board of Trustees of the Police Officers' Variable Supplements Fund,* 937 F.2d 752, 758 (2d Cir.1991) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). "If it appears that the federal claims ... could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, the court should refrain from exercising pendent jurisdiction absent exceptional circumstances." *Kavit v. A.L. Stamm & Co.,* 491 F.2d 1176, 1180 (2d Cir.1974). Because Cardona's federal claims have been disposed of on a motion for summary judgment, her state claim is hereby **dismissed without prejudice.**

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (dkt. # 16) is **GRANTED** with respect to plaintiff's federal claims. Judgment in favor of the defendant shall enter on Count Two of the complaint. Count One of the complaint is **DISMISSED without prejudice.** The Clerk of the Court shall close this file.