**UNITED STATES of America**

v.

**Richard BRECKENRIDGE**

**No. CRIM.A. 3:05CR7(SRU).**

United States District Court,
D. Connecticut.

Nov. 9, 2005.

Audrey A. Felsen, Stamford, CT, Bruce D. Koffsky, Stamford, CT, Frank J. Riccio, Bridgeport, CT, Frank J. Riccio, II, Law Offices Of Frank J. Riccio, Bridgeport, CT, for defendant.

Kevin J. O'Connor, U.S. Attorney's Office, New Haven, CT, Peter S. Jongbloed, U.S. Attorney'S Office, New Haven, CT, Robert M. Spector, U.S. Attorney's Office, Hartford, CT, Stephen Benjamin Reynolds, U.S. Attorney's Office, Bridgeport, CT, for U.S.

### *RULING ON MOTION TO SUPPRESS*

UNDERHILL, District Judge.

Richard Breckenridge has been charged with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On

June 30, 2005, Breckenridge filed a motion to suppress all tangible objects seized from his automobile, which was stopped by Bridgeport police on June 5, 2004. For the reasons that follow, Breckenridge's motion to suppress is denied.

## I. Factual Background

Based upon a suppression hearing on September 7, 2005, I find the following facts concerning the events of June 3–5, 2004.

On June 3, 2004, at 293 Judson Place, Bridgeport, Connecticut, James "King" Womack allegedly shot Kareem Hill several times, causing Hill to be hospitalized. Both shooter and victim were occupying their respective vehicles at the time of the shooting. On June 4, Hill identified Womack as the shooter from a photographic line-up conducted by Bridgeport police in Hill's hospital room.

On June 5, at about 7:18 p.m., Bridgeport police officers Manuel Cotto and Raymond Ryan responded to a harassment complaint at 195 Bunnell Street, which is the Hill family residence. Kareem Hill's mother, Synethia, reported that her other son, Melvin, had just returned from Kentucky and was greeted at the bus station by James Womack and his associates and that they had made threatening gestures and eye contact with him. She told Officer Cotto that she feared that Womack and his associates were trying to kill both of her sons. Both she and other members of the household further reported to the police that they had observed four vehicles continually driving up and down their street. The occupants of at least one of the vehi-

cles stopped in front of 195 Bunnell Street, reached into the back seat, and made threatening gestures, as if pulling out guns.[1]

Officer Cotto testified that he recalled Ms. Hill reporting that four vehicles were involved in the threatening conduct:

1) a black Oldsmobile, license plate number 198–SZS;

2) a green, newer model Cadillac with tinted windows;

3) a green Monte Carlo; and

4) a black, two-door, plain Monte Carlo without fancy rims.

The Hills reported to Officer Cotto that they were intimidated and feared for their safety.

Officer Cotto then set about scouring the neighborhood for vehicles matching the descriptions provided by the Hills. The vehicle used in the shooting of Kareem Hill had not been located, and Officer Cotto testified that, given the circumstances of the shooting, the shooter knew that the police were looking for him. Police had been able to determine that the owner of the car suspected of being used in the shooting lived at 257 Remington Street.

Officer Cotto left the Hill residence around 8:00 p.m., and at 9:00 p.m., he saw a black Chevrolet Monte Carlo with no wheel rims driving in the vicinity of 257 Remington Street. Officer Cotto believed that he was within a two-to-three-mile radius of the original shooting and the Hill house.[2] Moreover, he was just one block from 257 Remington Street, the home of the owner of the vehicle believed to have

1. The record is not clear regarding which car's occupants made threatening gestures. Officer Cotto testified that Ms. Hill lumped all four cars together when reporting the harassment. Accordingly, at the hearing, Officer Cotto was unable to conclusively testify that a

particular car's occupants engaged in specific gestures and threats.

2. A review of Government Exhibit 1 demonstrates that Officer Cotto was actually only about one mile from the Hill residence.

been used in the shooting. Officer Cotto testified that he could not see clearly the face of the driver, but that he saw the driver turn and look at him in a way that he thought was suspicious when he encountered the vehicle. Officer Cotto testified that the car he stopped matched the description given by Synethia Hill, and he stopped the car to verify whether or not the driver had been involved in the shooting or in the harassment of the Hills. Officer Cotto testified that he did not recognize the driver as matching the description of any of the individuals named as suspects in the shooting, but rather stopped the car to ascertain the driver's identity, because the car matched the description provided by the Hills.

After Officer Cotto stopped the car, Officer Amato saw an extended magazine loaded with bullets in plain view on the passenger side of the car. The officers searched the car and found a semi-automatic pistol. They arrested the driver, Richard Breckenridge, who was later charged with violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (felon in possession of a firearm and ammunition).

## II. Discussion

### A. Burden of Proof

■■■ In a motion to suppress physical evidence, the burden of proof is initially on the defendant. *United States v. Flores*, 2000 WL 1597880, *2 (S.D.N.Y.2000). Once the defendant has established some factual basis for the motion, the burden shifts to the government to show that the search was lawful. *Id.* The standard of proof on the party who carries the burden is a preponderance of the evidence. *United States v. Allen*, 289 F.Supp.2d 230, 242 (N.D.N.Y.2003).

### B. The Reasonable Suspicion Standard

#### 1. Reasonableness

■■■ The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amendment IV. "The temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of persons within the meaning of the Fourth Amendment." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810, 116 S.Ct. 1769. Reasonableness, however, does not necessarily require a finding of probable cause, because "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■■■ In assessing whether a stop is reasonable under the circumstances, the court must determine whether "the officer's action was justified at its inception." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. Further, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. 1868. Those facts must be "judged against an objective standard: would the facts available to the officer at the moment of seizure ... 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Cardona v. Connolly*, 361 F.Supp.2d 25, 30 (D.Conn.2005) (quoting

*Terry,* 392 U.S. at 21–22, 88 S.Ct. 1868). Because reasonable suspicion is an objective standard, "the subjective intentions or motives of the officer making the stop are irrelevant." *United States v. Bayless,* 201 F.3d 116, 133 (2d Cir.2000). The standard is whether the officer himself can articulate facts and what his experience reveals about those facts such that a reasonable person in the officer's shoes objectively would have stopped the suspect. WAYNE R. LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.5(a) (4th ed. 2004) ("LAFAVE, SEARCH & SEIZURE").

■ Both the United States Supreme Court and the Second Circuit have provided guidance for determining what quantum of suspicion is necessary to meet the reasonable suspicion test, despite the reality that "the concept of reasonable suspicion is not susceptible to precise definition." *United States v. Glover,* 957 F.2d 1004, 1009 (2d Cir.1992). Although "reasonable suspicion is not a high threshold," *United States v. Lawes,* 292 F.3d 123, 127 (2d Cir.2002), reasonable suspicion must be "based upon specific and articulable facts of unlawful conduct." *United States v. Scopo,* 19 F.3d 777, 781 (2d Cir.1994). "Reasonable suspicion is a less demanding standard than probable cause, [but] officers must be able to articulate more than inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (quoting *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

### 2. *Totality of the Circumstances*

■ Whether police officers had a reasonable suspicion that criminal activity was afoot is determined by examining the "totality of the circumstances." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *Dia-*

*mondstone v. Macaluso,* 148 F.3d 113, 124 (2d Cir.1998). The Supreme Court has held that a reviewing court must:

> look to the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. *Id.* at 418, 101 S.Ct. 690; *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Although an officer's reliance on a mere "hunch" is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).

*Arvizu,* 534 U.S. at 274, 122 S.Ct. 744.

■ In evaluating the "totality of the circumstances," the court must do so "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Bayless,* 201 F.3d at 133 (quoting *United States v. Oates,* 560 F.2d 45, 61 (2d Cir.1977)). "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions...." *Sokolow,* 490 U.S. at 11, 109 S.Ct. 1581. At the same time, however, "a district court judge must not merely defer to the police officer's judgment." *Bayless,* 201 F.3d at 133. "The scheme of the Fourth Amendment

becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868.

## C. *Application of the Reasonable Suspicion Standard*

Here, Officer Cotto relied on enough objective factors that, under the totality of the circumstances, gave him reasonable suspicion to stop Breckenridge.

Reasonable suspicion may be based on a combination of a number of factors, including law enforcement's specialized knowledge and investigative inferences, personal observation of suspicious behavior, and information from sources that have proven to be reliable. *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir.2002) (citing *Cortez*, 449 U.S. at 417–19, 101 S.Ct. 690; *Terry*, 392 U.S. at 21, 88 S.Ct. 1868). It may also be based on the known or probable direction of the offender's flight, the number of persons in the area, the breadth of the geographic area, and information conveyed via police channels. LAFAVE, SEARCH & SEIZURE § 9.5. Although each factor standing alone might carry little or no weight in the reasonable suspicion calculus, the "totality of the circumstances test" requires courts to consider all of the factors, together with an officer's specialized training, in making reasonable inferences. *Arvizu*, 534 U.S. at 275, 122 S.Ct. 744.

Officer Cotto received reliable information from known citizen informants. He stopped Breckenridge about one mile from the Hill residence, less than half a mile from the site of the original shooting, and a mere block away from the residence of the owner of the vehicle suspected to have been used in the shooting. Additionally, he stopped Breckenridge within an hour of the Hills' complaint. Officer Cotto had specific information about the color, make, and model of the suspected vehicle, and his stop of Breckenridge was consistent with that information. Finally, Officer Cotto received reliable information from the Hills and through police channels that one of the Hills had been shot and that the other members of the family, particularly Melvin Hill, had been threatened. It was therefore reasonable for Officer Cotto to infer that the suspect was armed and was likely to engage in further violence. Although each of those factors standing alone may have been insufficient to support a finding of reasonable suspicion, when considered together, the totality of the circumstances provides an adequate basis for the stop.

That conclusion is buttressed by the Third Circuit's holding in *United States v. Nelson*, 284 F.3d 472, 484–85 (3d Cir.2002), which presented a factual scenario very similar to the stop of Breckenridge. In *Nelson*, an anonymous informant telephoned police to report that two black males were holding up drug dealers and were driving a gray BMW. *Id.* at 475. The caller said that the car was driving along Martin Luther King Drive and that there was reason to believe that the occupants would engage in further violence. The officer on duty broadcasted the information to police officers in the area.

At some point thereafter, officers driving along Martin Luther King Drive stopped Nelson, who was driving a gray BMW that matched the description from the police broadcast.[3] *Id.* The officers no-

---

**3.** The officers also indicated that Nelson committed a minor traffic infraction, but that was

ticed a gun protruding from Nelson's waistband in plain view, and they placed him under arrest. Nelson was on parole and had previously been convicted of armed robbery.

The Third Circuit held that reasonable suspicion existed on those facts, primarily because the car matched the description on the police broadcast. *Id.* at 481. In fact, the court determined that it was reasonable for officers to rely on the broadcast alone, as long as the broadcast itself possessed sufficient indicia of reliability. *Id.* at 482. The thrust of the Third Circuit's discussion hinged on whether the tip itself was reliable given its anonymous nature. *Id.* at 481. If the tip had not been anonymous, the court implied, the question of reasonable suspicion would have been easy. *Id.* at 481.

Here, the facts are very similar to *Nelson*, and indeed, arguably pose a stronger case for the existence of reasonable suspicion. In *Nelson*, the police received an anonymous tip; here, Officer Cotto personally received information from several members of the Hill family, including Synethia Hill, Clarissa Hill, Melvin Hill, and Shelby Johnson, all of whom were known to him and several of whom he had interacted with during prior community policing. In *Nelson*, the police knew the color and make of the suspect's car, which had tags in the window; in this case, Officer Cotto knew the color, make, and model of the car associated with the threatening conduct. The Hills told him that a black, two-door Monte Carlo with no rims had been continually driving up and down their street, parking, and making threatening gestures. In addition, Officer Cotto also knew that a group of up to four individuals had shot Kareem Hill two days earlier and had threatened Melvin Hill earlier in the day. Not more than one hour after leav-

ing the Hill residence, Officer Cotto stopped Breckenridge's black Chevrolet Monte Carlo with no rims. Not only was it the first car that Officer Cotto stopped after leaving the Hill residence, but it was also driving within a one-mile radius of the Hill house. Furthermore, it was driving in the vicinity of 257 Remington Street, an address of the owner of another vehicle suspected of being used in the shooting of Kareem Hill. Finally, Officer Cotto testified that when he approached the Monte Carlo, the driver turned and looked at him in a way that raised his level of suspicion.

Officer Cotto did not engage in stops to identify "suspicious" drivers in the area; indeed, Officer Cotto relied on several specific factors to justify his stop of Breckenridge, thereby distinguishing this case from the facts in *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (holding that a stop was improper where officers asked a "suspicious-looking" man to identify himself without any other articulable basis to suspect wrongdoing). After speaking with the Hills, Officer Cotto stopped one driver—Breckenridge. As it turned out, Breckenridge was not associated with the shooting or harassment of the Hills, but that does not mean that the stop was not justified at its inception. According to the Supreme Court, *Terry* accepts the risk that officers may stop innocent people. *Illinois v. Wardlow*, 528 U.S. 119, 127, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

In addition, Officer Cotto was acting in response to citizen complaints of ongoing violence and out of fear for their safety. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest simply to shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes

not the reason for the stop, nor was the traffic infraction considered by the reviewing court.

that it may be the essence of good police work to adopt an intermediate response." *Adams v. Williams*, 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

The possibility of future violence in this case adds to the reasonable suspicion calculus. In *Florida v. J.L.*, 529 U.S. 266, 273–74, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), the Supreme Court ruled that there is no "gun exception" to the reasonable suspicion requirement. The Court focused its decision on the reliability of informants' tips and whether the indicia of reliability may be lowered if the tip indicates that the suspect may have a gun. *Id.* The Court rejected the contention that allegations of gun possession lessen the reliability that is otherwise required. *Id.* at 273–74, 120 S.Ct. 1375.

The Court did not, however, affirmatively preclude the notion that the existence of guns or continued violence could be one factor among others contributing to the reasonable suspicion calculus. Indeed, in *Nelson*, the Third Circuit emphasized that the critical element of the tip was not the mere fact that the presence of a gun was alleged, but rather that violent crimes were in the process of being committed. *Nelson*, 284 F.3d at 483. According to the Third Circuit, the holding of *J.L.*:

> did not disturb the Supreme Court's consistent prior teaching that an officer, in determining whether there is reasonable suspicion, may take into account reports of an active threat, including the presence and use of dangerous weapons. *J.L.* did not disturb the officers' ability to consider the prospect of harm to others or to themselves, for that matter.

*Id.* at 483.

Prior to *J.L.*, Second Circuit case law supported the assertion that, when a tip concerned an individual with a gun, the totality of the circumstances test should include the possibility of gun possession

and the subsequent need for prompt investigation. *United States v. Bold*, 19 F.3d 99, 104 (2d Cir.1994); *United States v. Harrell*, 268 F.3d 141, 150 (2d Cir.2001) (Meskill, J., concurring). After *J.L.*, it is clear that the possibility of the presence of a gun alone cannot lower the threshold required for reasonable suspicion, but the possibility of ongoing violence is one factor that the court may consider in determining if officers acted reasonably under the circumstances. *See Nelson*, 284 F.3d at 483.

Here, Officer Cotto knew that Kareem Hill had been shot on June 3, 2004. He also knew that Melvin Hill had been threatened on June 5 and that the Hill family had endured a series of threats and harassment by occupants of cars on the street. It was reasonable, therefore, for Officer Cotto to infer that continued violence was likely and to take that inference into account when making his reasonable suspicion calculus.

The Seventh Circuit decision in *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir.2003), is also instructive. In *Wimbush*, a police officer responded to a shooting in which the police dispatcher described the suspect as a black male driving a burgundy or maroon Ford Explorer with shiny rims. *Id.* About fifteen minutes after the shooting, in an area eight blocks away, an officer stopped a purple Explorer with shiny rims driven by an unknown black male, in order to ascertain his identity. *Id.* When the officer stopped Wimbush, he smelled marijuana and saw an open bottle of alcohol in plain view and subsequently arrested him. *Id.*

The Seventh Circuit, in evaluating the totality of the circumstances, held that the stop was reasonable. *Id.* at 950. The defendant argued that the police stopped him only because he was black. The court rejected that proposition, however, and

held that there were enough objective factors other than the defendant's race to give the police reasonable suspicion to stop him. *Id.* The court focused on the fact that Wimbush was driving a substantially similar vehicle to the one driven by the suspect (purple SUV with shiny rims) in close temporal and geographic proximity to the shooting. *Id.* at 950.

The facts here are very similar to those of *Wimbush,* but here, Breckenridge does not argue that Officer Cotto stopped him just because he was black. Rather he argues that the vehicle description (color, make, and model), geographic proximity, temporal proximity, presence of the possibility of ongoing violence, and a suspicious look toward Officer Cotto, taken as a whole, constitute an inadequate basis for reasonable suspicion.

Notwithstanding the similarity of the facts in this case to those of *Nelson* and *Wimbush,* the defense argues that a Second Circuit decision, *United States v. Swindle,* 407 F.3d 562 (2d Cir.2005), should control. In *Swindle,* police officers were looking for a man named Kenneth Foster–Brown, who was a fugitive wanted for dealing drugs. Foster–Brown had been seen near a Pontiac Bonneville but was not known to drive it. Officers saw a Pontiac Bonneville pull up to a house that Foster–Brown had supplied with drugs in the past. They watched as a black man exited the Bonneville, entered the house, and left a short time later in the Bonneville. The police then stopped the Bonneville to ascertain whether or not it was Foster–Brown.

The Second Circuit determined that the police did not have reasonable suspicion to justify stopping Swindle.[4] The Court reasoned that "ultimately, the officers ordered Swindle to stop because they believed him

to be a 'black male meeting the description of Foster–Brown,'" and "wished to confirm or dispel their suspicions that the Bonneville's driver was Foster–Brown." *Swindle* at 569. Importantly, the Court stressed that race alone is not a permissible basis upon which to stop a suspect. The *Swindle* Court held that the officers pulled over Swindle because he was a black man in a high crime area driving a car that the wanted fugitive had previously been seen near. *Swindle* at 571.

*Swindle* poses a very different set of facts than the instant case. Here, the police had detailed information from several sources known personally to them that indicated that a suspect was actually driving a black Monte Carlo. The Hills told Officer Cotto that a black Monte Carlo was one of the four vehicles harassing them and making threatening gestures. Thus, the link between the car and the suspect is much stronger than in *Swindle.* It was the description of the black Monte Carlo, in combination with the temporal and geographic proximity to the areas in question, that drove the investigation—not Breckenridge's skin color. In *Swindle,* the officers testified that they stopped Swindle because he was a black male, and they wanted to see if he was Foster–Brown. In this case, however, Officer Cotto stopped the car primarily because of the physical description of the car and its apparent link to the suspects in the harassment and shooting of the Hills. Therefore, although the facts of *Swindle* have a certain surface similarity to this case, upon closer inspection, it becomes clear that the central focus of Swindle was very different.

## III. Conclusion

For the foregoing reasons, considering the totality of the circumstances, I find

---

**4.** It should be noted, however, that the Second Circuit affirmed Swindle's conviction, because events that transpired from the time officers stopped Swindle until the time they physically restrained him provided the additional factors necessary for probable cause.

that Officer Cotto had reasonable suspicion to stop Breckenridge's black Chevrolet Monte Carlo.

Defendant's Motion to Suppress (doc. # 43–1) is DENIED.

It is so ordered.