**UNITED STATES of America,
Appellee,**

v.

**Swazine SWINDLE, Defendant–
Appellant.**

**Docket No. 03–1773.**

United States Court of Appeals,
Second Circuit.

Argued: Sept. 23, 2004.

Last Supplemental Brief Filed:
Feb. 22, 2005.

Decided: May 11, 2005.

John Humann, Federal Public Defender's Office, Western District of New York, Buffalo, N.Y. (MaryBeth Covert, of counsel), for Defendant–Appellant.

Michael Digiacomo, Assistant United States Attorney, Western District of New York, Buffalo, N.Y. (Michael A. Battle, United States Attorney, on the brief), for Appellee.

Before: FEINBERG, CARDAMONE, and PARKER, Circuit Judges.

FEINBERG, Circuit Judge.

■ Swazine Swindle appeals from a judgment of conviction of the United States District Court for the Western District of New York (Skretny, J.) entered after pleading guilty to unlawfully possessing a controlled substance in violation of 21 U.S.C. § 844(a).[1] The appeal poses the ultimate question whether on this record the Fourth Amendment requires exclusion of evidence the police obtained as a result of unreasonably initiating a *Terry* stop.[2] The officers in this case, although lacking

---

1. The district court sentenced Swindle to time served plus one year of supervised release.

2. In a *Terry* stop, discussed in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may briefly seize someone and conduct a limited search for weapons if the officer reasonably suspects the person of being involved in criminal activity. *Id.* at 27, 30–31.

reasonable suspicion of Swindle's criminal activity, ordered him to pull his car over. He did not immediately do so, subsequently breaking two traffic laws and throwing a bag of drugs out of his window before being apprehended while fleeing on foot. Swindle argues that the police seized him the moment they ordered him to pull over, and that the drugs therefore should have been suppressed as the fruit of an unconstitutional seizure. The government argues that the officers did not seize Swindle until they physically apprehended him, and that his behavior by then furnished ample grounds for his arrest. Constrained by relevant Supreme Court decisions, we affirm the judgment of the district court.

## I. Background

### A. Swindle's Arrest

Four Buffalo police officers assigned to an FBI career criminal task force were patrolling the city in an unmarked car on June 11, 2002, in search of Kenneth Foster–Brown, a fugitive wanted for dealing drugs. All four officers had on previous occasions encountered Foster–Brown, a black man who was 5′8″ tall and at the time weighed 145 pounds. Defendant-appellant Swindle, also a black man, is 6′1″ tall and in June 2002 weighed 215 pounds.

During their patrol, the officers saw a black Pontiac Bonneville, a model of car that Foster–Brown had previously been seen "near" but had never been known to drive. The officers saw the car come to a halt in front of a known drug house that Foster–Brown had supplied in the past. The officers stopped their car and watched as a black man got out of the Bonneville, entered the house, left a short time later and drove away. The officers were unable to tell whether the man was Foster–Brown. In fact, the man in the Bonneville was Swindle. Thinking that he might be Foster–Brown, the officers followed in

their car. Within a minute, by activating their police strobe light, they ordered Swindle to pull over.

Swindle disobeyed the officers' order to stop and kept driving. As he did, he violated two traffic laws by crossing a double yellow lane divider and driving the wrong way on a one-way street. Swindle also reached into the visor above the driver's seat, attempted to throw something out of the window and ultimately succeeded in throwing a plastic bag out of the car. The bag was found to contain 33 smaller bags of crack cocaine. Swindle eventually pulled over and fled on foot. The police apprehended him in a yard and placed him under arrest. He was charged with unlawful possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

### B. The Suppression Hearing

Swindle moved to suppress the drugs on the ground that they were the fruit of an illegal seizure. A magistrate judge held a hearing at which one of the arresting officers and Swindle testified. According to the officer, the man who entered the drug house was a "dark skinned black male, approximately six foot tall, wearing a white muscle shirt, T shirt." The officer admitted that he knew Foster–Brown to be a "5′8″, 150 pound[ ] . . . black male." The officer also conceded that when Swindle was ordered to pull over, Swindle "had violated no Vehicle and Traffic law at that time." Moreover, when asked whether he had seen Swindle "do anything illegal in any way, shape or form that day," the officer answered: "Not prior to activating the courtesy light." Further, the officer was asked "what was . . . your reason, the sole reason you activated your emergency light at that point?" He answered: "To ascertain if, in fact, Mr. Swindle was, in fact, Kenneth Foster Brown." Swindle

testified that he was 24 years old, 6'1" tall and weighed 215 pounds on June 11. The government did not rebut or attempt to discredit this testimony.

## C. The Magistrate Judge's Report and Recommendation

The magistrate judge first determined whether Swindle abandoned the drugs before or after being seized. Looking principally to three Supreme Court decisions for guidance on this question, the magistrate judge cited *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), in which the Court stated that a seizure requires *"either* physical force...*or*, where that is absent, *submission* to the assertion of authority." *Id.* at 626, 111 S.Ct. 1547 (emphasis in original). The magistrate judge also cited *Brower v. County of Inyo*, 489 U.S. 593, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989), in which a 20–mile police chase of the defendant was presumed not to be a seizure, *id.* at 596–97, 109 S.Ct. 1378, and quoted *County of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), which stated that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." *Id.* at 844, 118 S.Ct. 1708. In light of these precedents, the magistrate judge concluded that since "the defendant was being pursued by the police, he had not been seized when he was observed discarding...[a] sandwich bag containing crack cocaine."

The magistrate judge next decided whether the officers had a legitimate basis for both ordering Swindle to stop and later arresting him. Citing Swindle's presence at a known drug house, his refusal to pull over when ordered to do so, his violation of two traffic laws and his throwing the plastic bag from the window, the magistrate judge ruled that "by the time the defen-dant was actually seized, the police officers possessed not only reasonable suspicion to stop the vehicle, but probable cause to arrest the driver."

Accordingly, the magistrate judge concluded that since "the crack cocaine had been discarded by the defendant prior to his seizure and [since] the defendant's subsequent seizure was supported by probable cause, I recommend that the defendant's motion to suppress the physical evidence be denied."

## D. Swindle's Guilty Plea and Sentencing

In a two-page order, the district court accepted the magistrate judge's Report and Recommendation "in its entirety, including the authorities cited and the reasons given therein." Following entry of this order, Swindle agreed to plead guilty to a lesser included charge: unlawful possession of a controlled substance in violation of 21 U.S.C. § 844(a). Included in Swindle's plea agreement was a reservation of "the right to appeal the denial of the defendant's suppression motion."

The district judge accepted Swindle's guilty plea on July 24, 2003. Swindle had been in the custody of the United States Marshals since June 26, 2002. After accepting Swindle's guilty plea, the judge released him on bail. In November 2003, the judge sentenced Swindle to time served plus one year of supervised release.

This timely appeal followed.

## II. Discussion

On appeal, Swindle argues that the drugs he threw from his car should have been suppressed as the fruit of an illegal seizure. Swindle claims that he was seized at the "moment the emergency overhead lights went on" in the officers' vehicle, at which time the police lacked reasonable suspicion to order a stop. The govern-

ment argues that Swindle was not seized for Fourth Amendment purposes until the officers "physically grabbed him in the yard," by which time Swindle's behavior had generated probable cause for an arrest. The district court ruled for the government, finding that Swindle was not "seized" within the meaning of the Fourth Amendment until the officers physically apprehended him. Accordingly, the court ruled that the drugs Swindle discarded prior to his capture were admissible. Since the court's ruling on the suppression motion turned on the legal question of when Swindle was seized, we review the decision de novo. *See United States v. Peterson*, 100 F.3d 7, 11 (2d Cir.1996) ("Whether, in light of the facts, a seizure occurred is a question of law to be reviewed *de novo*.").

A. The Order to Stop

■ Swindle asserts—and the government does not dispute—that the officers *initiated* a *Terry* stop of Mr. Swindle when, with overhead emergency lights activated, they tried to pull over his vehicle. We agree that any reasonable driver would understand a flashing police light to be an order to pull over, although the Supreme Court has said that such an order would not give rise to a "stop" unless the driver submitted to the order or was physically apprehended. *See Hodari D.*, 499 U.S. at 626, 111 S.Ct. 1547. The "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). An "automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.* at 810, 116 S.Ct. 1769; accord *Delaware v. Prouse*, 440 U.S. 648,

650, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In other words, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

■ We review a district court's finding of reasonable suspicion de novo. *See Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) ("[D]eterminations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal.").

The magistrate judge—whose recommendations the district court adopted in their entirety—concluded that Swindle's

> presence at a known [drug] house for a short period of time; failure to pull over upon activation of police emergency lights; act of reaching into the fabric material between the roof of the driver's compartment of the car over the windshield and thereafter attempting to discard an object from the vehicle; and then actually discarding a knotted off clear sandwich bag, provided the officers with reasonable suspicion to stop the defendant....

With the exception of Swindle's entering the drug house, all of the events on which the magistrate judge relied in finding reasonable suspicion occurred after the officers *initiated* the *Terry* stop by ordering Swindle to pull over. The magistrate judge relied on a Ninth Circuit decision in which the "pivotal issue [was] whether the 'founded suspicion' essential to the stop of [the defendant's] car [could] be based in part on events occurring after the border patrol car turned on its red lights and

siren, but before [the defendant's] car was actually stopped after a chase." *United States v. Santamaria–Hernandez,* 968 F.2d 980, 981 (9th Cir.1992). The court there decided that the "determination whether [the police] have founded suspicion to justify a stop may take into account all of the events that occur up to the time of physical apprehension of a suspect who flees." *Id.* at 983.

Our circuit has never squarely decided whether reasonable suspicion may be premised upon events occurring after a person is *ordered* to stop but before he or she is physically apprehended.[3] The parties' supplemental briefs did not direct us to any compelling authority from other jurisdictions.[4]

The circuits that have confronted the question have held or suggested that events occurring between the initiation and completion of a *Terry* stop may contribute to a finding of reasonable suspicion for the stop. *See United States v. Valentine,* 232 F.3d 350, 359 (3d Cir.2000) ("[W]hat [the defendant] did after he failed to comply with the police officers' orders can be considered in evaluating reasonable suspicion."); *United States v. Johnson,* 212 F.3d 1313, 1317 (D.C.Cir.2000) (basing finding of reasonable suspicion on defendant's "furtive" hand gestures made after officer, apparently without justification, drew gun and ordered defendant to put his hands up); *Watkins v. City of Southfield,* 221 F.3d 883, 889 n. 3 (6th Cir.2000) (fa-

vorably citing *Santamaria–Hernandez* ); *Santamaria–Hernandez, supra.*

While not explicitly addressing the point from which reasonable suspicion must be measured, other courts have emphasized that a stop must be justified at its inception. *See Feathers v. Aey,* 319 F.3d 843, 848–49 (6th Cir.2003) ("The question is whether, at the moment that they initiated the stop, the totality of the circumstances provided the officers with the reasonable suspicion required in order to detain a citizen under *Terry.*"); *United States v. Finke,* 85 F.3d 1275, 1279 (7th Cir.1996) ("Under *Terry* the stop must be justified at its inception...."); *United States v. Crain,* 33 F.3d 480, 485 (5th Cir.1994) ("[T]he issue of whether an investigatory detention or traffic stop complies with the Fourth Amendment depends [in part] upon...whether the stop was justified at its inception."); *United States v. Walker,* 933 F.2d 812, 815 (10th Cir.1991) (noting that, to uphold a *Terry* stop, a court must determine "whether the officer's action was justified at its inception") (internal quotation marks omitted).

■ Upon consideration of the issue, we believe that a police officer should not be empowered to order someone to stop unless the officer reasonably suspects the person of being engaged in illegal activity. We find this position most faithful to *Terry* 's own prescription that, when stopping a suspect, a police "officer's action [be] justified at its inception." *Terry,* 392 U.S.

---

3. In *United States v. Lifshitz,* 369 F.3d 173, 188 (2d Cir.2004), we quoted the Supreme Court's observation that the "principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search." *Ornelas,* 517 U.S. at 696, 116 S.Ct. 1657. Neither *Lifshitz* nor *Ornelas* involved, however, a defendant disobeying an order to stop, subsequently behaving suspiciously and then being physically apprehended. Conse-

quently, neither Court was squarely presented with the question whether reasonable suspicion may be based on events occurring between initiation and completion of a stop.

4. We requested and received supplemental briefs from the parties on the question whether applicable law requires the police to have reasonable suspicion that criminal activity is occurring before ordering a motorist to stop.

at 20, 88 S.Ct. 1868. The settled requirement is, of course, that reasonable suspicion must arise before a search or seizure is actually effected. As the Supreme Court has held, the "reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." *Florida v. J.L.*, 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000); *see also Peterson*, 100 F.3d at 10 ("If a seizure or investigatory detention has occurred, it must have been based on a reasonable suspicion supported by articulable facts that criminal activity may be afoot.") (internal quotation marks omitted); *United States v. Como*, 340 F.2d 891, 893 (2d Cir.1965) ("[I]t is an elementary maxim that a search, seizure or arrest cannot be retroactively justified by what is uncovered."). The rule is therefore clear that an illegal stop cannot be made legal by incriminating behavior that comes after the suspect is stopped. And if subsequent incriminating events cannot justify an unreasonable stop, then it logically follows that subsequent incriminating events should not be able to justify an unreasonable *order* to stop. Unreasonable stops and unreasonable orders to stop are both abuses of police power, and we see no principled basis for prohibiting the former but not the latter.

■ It appears, however, that current Fourth Amendment jurisprudence draws just such a distinction. *Hodari D.* strongly implies—without explicitly holding—that an unreasonable order to stop does not violate the Fourth Amendment and that the grounds for a stop may thus be based on events that occur after the order to stop is given. *See* 499 U.S. at 629, 111 S.Ct. 1547. In *Hodari D.*, the police pursued Hodari, who had been standing in a group of young men in a high-crime neighborhood, after he fled upon seeing the officers. *Id.* at 622–23, 111 S.Ct. 1547.

During the pursuit but before an officer tackled him, Hodari discarded what turned out to be cocaine. *Id.* at 623, 111 S.Ct. 1547. The Supreme Court held the cocaine admissible on the ground that Hodari voluntarily discarded it before being seized. *Id.* at 629, 111 S.Ct. 1547.

Of special note to our discussion here, the *Hodari D.* Court made two critical observations. First, it "accept[ed] as true for purposes of this decision[ ] that [the police] pursuit qualified as a show of authority calling upon Hodari to halt." *Id.* at 625–26, 111 S.Ct. 1547 (internal quotation marks omitted). Second, the Court "rel[ied] entirely upon the State's concession" that the police, at the moment they gave chase, "did not have the reasonable suspicion required to justify stopping Hodari." *Id.* at 623 n. 1, 111 S.Ct. 1547 (internal quotation marks omitted). Taken together, these two observations show that the Court reached its holding even while assuming for the sake of argument that the police had issued an unreasonable order to stop. The Court concluded that "since Hodari did not comply with that injunction [and] was not seized until he was tackled[, t]he cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied." *Id.* at 629, 111 S.Ct. 1547. No matter how unreasonable the order to stop was, the only question for Fourth Amendment purposes was whether reasonable suspicion existed at the moment Hodari was tackled. Since Hodari's pre-seizure behavior generated reasonable suspicion for a stop, the fact that the unheeded police order lacked such justification was irrelevant as a matter of Fourth Amendment law.

*Hodari D.* thus implicitly authorized a defendant's seizure based on events occurring after issuance of an unreasonable order to stop. We are therefore compelled

to conclude that the magistrate and district judges in Swindle's case did not err by considering events that occurred after Swindle was unreasonably ordered to pull over.

And the order to pull over was indeed unreasonable. Although we cannot say that the Fourth Amendment requires a police officer to have reasonable suspicion that criminal activity is afoot before ordering a person to stop, we believe that the order in Swindle's case was a clear abuse of police authority. At the moment they ordered Swindle to stop, the officers had merely observed an unidentified black man drive up to the drug house in a Bonneville (a model the police associated with Foster–Brown), enter the house, leave a short while later and then drive away.

This is not enough information on which to reasonably order a person to stop. First, the fact that Swindle drove a Pontiac Bonneville, a model of car that Foster–Brown had previously been seen "near," is insignificant given that the government failed to show that Foster–Brown drove a Bonneville or even that the one Swindle drove was the one Foster–Brown had been seen near. Cf. *United States v. Green*, 111 F.3d 515, 520 (7th Cir.1997) ("That on one occasion a car is parked on the street in front of a house where a fugitive resides is insufficient to create reasonable suspicion that the car's occupants had been or are about to engage in criminal activity."). Second, Swindle's entering a known drug house does not itself suggest that a crime was afoot. As the Supreme Court has noted, an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *see also Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61

L.Ed.2d 357 (1979) (finding no reasonable suspicion where defendant was observed in alley in neighborhood known for drug dealing and where police merely claimed that situation "looked suspicious").

Ultimately, the officers ordered Swindle to stop because they believed him to be "a black male meeting the description of Foster–Brown," and wished to "confirm or dispel their suspicions that the Bonneville's driver was Foster–Brown." The officers certainly may have suspected Swindle of being Foster–Brown, but the relevant question is whether that suspicion was reasonable. *See, e.g., Sokolow*, 490 U.S. at 7, 109 S.Ct. 1581 (noting that, to justify a stop, a police officer "must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch" ' ") (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868); *Brown*, 443 U.S. at 52, 99 S.Ct. 2637 ("[E]ven assuming that [crime prevention] is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it."). Under the government's argument, Swindle maintains, the "officers could have stopped any African–American or dark skinned person exiting the house...whether he was 6′ tall and over 200 lbs or 5′ tall and merely 100 pounds.... The only thing Mr. Swindle had in common with Foster–Brown is that they were both dark skinned." Indeed, we are puzzled by the government's assertion that Swindle was a man "meeting the description of Foster–Brown." On the day in question, as already indicated, Swindle was five inches taller—and 70 pounds heavier—than Foster–Brown.

It appears that the only obvious physical characteristic the men shared was the color of their skin. But courts agree that race, when considered by itself and some-

times even in tandem with other factors, does not generate reasonable suspicion for a stop. *See, e.g., Whren*, 517 U.S. at 810, 116 S.Ct. 1769 (referring to race as a "decidedly impermissible factor[ ]" on which to exclusively base a stop); *United States v. Brignoni–Ponce*, 422 U.S. 873, 885–87, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (holding that apparent Mexican ancestry of car occupants did not justify stop based on suspicion that they were illegal aliens); *Brown v. City of Oneonta, New York*, 221 F.3d 329, 334 (2d Cir.2000) (allowing plaintiffs to proceed with their Fourth Amendment claims in 42 U.S.C. § 1983 suit against city because plaintiffs were apparently seized on account of race, and "a description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure"); *United States v. Montero–Camargo*, 208 F.3d 1122, 1135 (9th Cir.2000) (en banc) ("Hispanic appearance is, in general, of such little probative value that it may not be considered as a relevant factor where particularized or individualized suspicion is required."); *United States v. Roberson*, 90 F.3d 75 (3d Cir.1996) (finding no reasonable suspicion to conduct investigatory stop where police relied solely on anonymous tip identifying black man in certain attire and location as drug dealer, and where police officers observed no behavior justifying stop); *United States v. Rias*, 524 F.2d 118, 121 (5th Cir.1975) (finding no reasonable suspicion for stopping two back men driving a Chevrolet where sole justification for stop was fact that men fitting that description were suspects in robbery that occurred two to four weeks before stop).

Having considered the " 'totality of the circumstances' . . . to see whether the detaining officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing," *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)), we have no difficulty concluding that the officers acted unreasonably in ordering Swindle to pull over. Swindle was simply a black man in a high-crime area driving a car that the wanted fugitive had previously been seen "near." As the officers conceded, Swindle had not been observed to break any law or do anything else to warrant a stop. Although we are precluded from holding that the officers' unreasonable order violated the Fourth Amendment, we believe that it was an abuse of authority for which Swindle and others like him might seek redress under a source of authority such as the Fourteenth Amendment or some provision of state law.

Requiring a police officer to have reasonable suspicion to order a stop would be truer to Fourth Amendment values than the current rule. *See, e.g., INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) ("The Fourth Amendment...is designed 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.' ") (quoting *United States v. Martinez–Fuerte*, 428 U.S. 543, 554, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)); *Prouse*, 440 U.S. at 653–54, 99 S.Ct. 1391 (noting that the "essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions' ") (footnote omitted) (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978)); *Diamondstone v. Macaluso*, 148 F.3d 113, 123 (2d Cir.1998) ("In terms of the impact on liberty, there is a fundamental difference between being

asked to answer questions in certain well-defined settings and being subjected to random detentions by government officials seeking information.").

## B. The Seizure

■ Swindle does not dispute the government's claim that the officers had probable cause to arrest him by the time he was physically apprehended. Instead, Swindle argues that he was seized when the officers activated their police light because no reasonable driver would have felt free to ignore that order to stop.[5]

Swindle's definition of "seizure" comes from a line of Supreme Court decisions that began with Justice Stewart's opinion in *United States v. Mendenhall*, which stated that a "person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). The Court there decided that the defendant had not been seized by the drug enforcement agents who approached and questioned her in an airport concourse because the agents

> wore no uniforms and displayed no weapons. They did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents. They requested, but did not demand to see the respondent's identification and ticket. Such conduct without more, did not

amount to an intrusion upon any constitutionally protected interest.

*Id.* at 555. "In short," wrote Justice Stewart, "nothing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure." *Id.* at 1878

The Court adhered to the *Mendenhall* definition of "seizure" in *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), where the defendant, a pedestrian, fled at the sight of an approaching police car. The officers followed by driving slowly alongside the defendant who, during his flight, discarded several packets. The packets contained drugs, and the defendant was charged with possession of a controlled substance. *Id.* at 569–70, 108 S.Ct. 1975. The state trial court dismissed the charges, finding that the police pursuit had amounted to an unreasonable seizure. *Id.* at 570, 108 S.Ct. 1975. The state appeals court affirmed, and the state supreme court denied leave to appeal. *Id.* The United States Supreme Court reversed, holding that the defendant abandoned the drugs before being seized. The Court explained that

> the police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon respondent's freedom of movement. *The record does not reflect that the police activated a siren or flashers; or that they com-*

---

**5.** Swindle cites a New York traffic law to underscore his argument that he was not free to ignore the officers' order to pull over. That law reads: "No person shall fail or refuse to comply with any lawful order or direction of any police officer or flagperson or other person duly empowered to regulate traffic." N.Y. Veh. & Traf. Law § 1102 (McKinney 1996). Swindle argues that this

law illustrates how drivers, as compared to pedestrians, are especially constrained when confronted with a police order to stop. Since we believe that even without a law such as § 1102, a reasonable person would feel obliged to pull over in response to a flashing police light, it is not necessary to address Swindle's contention regarding the effect of state law in this case.

*manded respondent to halt,* or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement. While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure.

*Id.* at 575, 108 S.Ct. 1975 (emphasis supplied) (footnotes and citations omitted). Accordingly, the Court remanded the case for further proceedings. *Id.* at 576, 108 S.Ct. 1975.

In this case, *Mendenhall* and *Chesternut* appear to favor Swindle: a reasonable driver clearly would not feel "free to disregard the police presence and go about his business," *id.,* in the face of a flashing police light. If such a feeling were the sole determinant of what constitutes a seizure, Swindle probably would have won suppression of the evidence against him. But in *Hodari D.,* the Court explained that *Mendenhall*'s rule of a seizure occurring "only if" a reasonable person would feel restrained by a police order "states a *necessary,* but not a *sufficient,* condition for seizure." 499 U.S. at 628, 111 S.Ct. 1547 (emphasis in original). Merely feeling restrained is not enough, as the "word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *Id.* at 626, 111 S.Ct. 1547. The word "seizure," the Court said, "does not remotely apply...to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure." *Id.* A seizure thus requires "*either* physical force...*or,* where that is absent, *submission* to the assertion of authority." *Id.* (emphasis in original). Given this, the Court concluded that Hodari, who had fled at the mere sight of the police and discard-

ed drugs before being apprehended, was not entitled to suppression of the evidence against him.

In reaching its result, the *Hodari D.* Court cited *Brower v. County of Inyo,* in which the police pursued the driver of a stolen car for approximately 20 miles before the driver crashed into a police-erected roadblock. The *Brower* Court had decided that the driver's collision with the roadblock amounted to a seizure because "Brower was meant to be stopped by the physical obstacle of the roadblock— and...he was so stopped." 489 U.S. at 599, 109 S.Ct. 1378. But as the *Hodari D.* Court later explained, it "did not even consider the possibility that a seizure could have occurred during the course of the chase because...that 'show of authority' did not produce [Brower's] stop." 499 U.S. at 628, 111 S.Ct. 1547.

Seven years after *Hodari D.* was decided, the Court followed this rule that an order to stop must be obeyed or enforced physically to constitute a seizure. In *County of Sacramento v. Lewis,* the Court observed that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment." 523 U.S. at 844, 118 S.Ct. 1708. Put simply, "[a]ttempted seizures of a person are beyond the scope of the Fourth Amendment." *Id.* at 845 n. 7, 118 S.Ct. 1708.

In light of the above cases, we must conclude that Swindle was not seized until the police physically apprehended him, and therefore that the drugs did not have to be suppressed as the fruit of a poisonous tree. *See Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). Regardless of how unreasonable it was for the officers to *order* him to pull over, and regardless of how reasonable it was for Swindle to have felt restrained in the face

of the flashing police strobe light, there was no immediate "physical force" applied or "submission to the assertion of authority." *See Hodari D.,* 499 U.S. at 626, 111 S.Ct. 1547. Therefore, no seizure immediately occurred. The drugs that Swindle abandoned before being apprehended were thus not the product of a Fourth Amendment seizure.

A substantial argument could be made that a broader definition of "seizure"—or some other remedy—is required to adequately protect Fourth Amendment values from the harms flowing from police initiation of *Terry* stops without reasonable suspicion. Although the *Hodari D.* Court stated that "[o]nly a few of those orders [to stop], we must presume, will be without adequate basis," *id.* at 627, 111 S.Ct. 1547, the possibility that unreasonable orders are infrequent does not necessarily make them acceptable. Even if the kind of order given in Swindle's case is rare—and we do not suggest that it is—we see no persuasive reason for the law to tolerate it. In view of what we believe to be the controlling cases, however, we must affirm a conviction that was achieved with evidence obtained by an abuse of police power. A remedy for Swindle's Fourth Amendment complaint can come only from higher authority.

## III. Conclusion

As we are compelled to hold that Swindle was seized only when the police physically apprehended him—at which time the officers had probable cause for an arrest— we must conclude that the drugs Swindle discarded prior to his apprehension were not the fruit of a Fourth Amendment seizure. We therefore affirm Swindle's conviction.