Associate Chief Justice NEHRING,
concurring and dissenting in part:
1183 I concur in the court's equal protection analysis and agree with the judgment of the court that the traffic stop of Mr. Chette-ro did not infringe his right to travel. However, the majority explains that any discrimination in this case "was based on intelligence that suggested marijuana would be transported from California (where it was grown) across Utah ... [slo any differential treatment was not based on the 'mere fact' that Chettero was a citizen of another state."[1] The only information that animated law enforcement to make the high volume of traffic stops that included Mr. Chettero was that marijuana could come from out of state. Had troopers stopped cars based on the mere fact of bearing foreign license plates, their activities would have been more suspect. Still, Justice Lee's analytic approach, when examined more closely, actually concedes the "mere fact" point. The troopers were after drugs. They had received word that the bounty of the California marijuana harvest was coming this way and decided to do something about it. During the interdiction exercise, 95-99 percent of all the cars stopped, and all twenty-three of the cars stopped by the trooper in question, were from out of state.[2] Whatever else might be said about the trooper's motives, it is safe to say they were not responding to an epidemic of motorists crossing the fog line. Based on what law enforcement knew, out-of-state marijuana was transiting Utah, transported in vehicles bearing out-of-state license plates. A foreign license plate was not one of several reasons given for stopping cars, it was the only reason. Was it unconstitutional? No. The stops were supported by a rational basis and affected lesser interests than those targeted in right to travel cases.
4 34 I am troubled by the court's analysis in Part ILB. and for the reasons set out below, cannot join it. Mr. Chettero pressed his Fourth Amendment claim after the court rejected his right to travel and equal protection arguments. His suppression motion was heard by a new judge and, like most suppression motions, it was a credibility contest. The following exchange captures the flavor of testimony concerning the purpose of the stops.
Q: And wasn't the primary goal to interdict marijuana for out-of-state plate vehicles?
No.
What was the purpose of it?
Make high volumes traffic stops.
High volumes traffic stops?
Yes.
High volumes of out-of-state traffic stops?
Not specifically out-of-state.
Do you know what the statistics are? Because we have it in evidence in this case already for how many you stopped for out of state people versus in-state.
MR. BRICKEY: Objection. Irrelevance.
THE COURT: Sustained. That's already been addressed ... by the court, then ruled on by the court.
MR. DELIA: Oh, absolutely. Ill move on. And, again, I was only getting into the credibility of the officer and what this officer would say on the stand today versus what the court did find.
During argument before the district court, Mr. Chettero's counsel again mentioned the statistics, specifically reading from a memorandum filed with the court before the hearing that cited State v. Lopez:
[Aln officer's subjective suspicions unrelated to the traffic violation for which he or she stops a defendant can be used by defense counsel to show that the officer fabricated the violation. The more evidence that detention was motivated by police suspicions unrelated to the traffic *591 offense, the less credible the officer's assertion that the traffic offense occurred.[3]
The court responded that it is constitutionally acceptable to target out-of-state cars. The majority acknowledges that the court "may have misapprehended Chettero's argument," [4] possibly confusing it with his right to travel and equal protection arguments.
4 35 The statistical evidence was both relevant and admissible for impeachment purposes, and the trial court abused its discretion when it rejected it. The lead opinion asserts that there "was either no error at all or that any error was harmless" in excluding the evidence because the evidence might not have impacted Trooper Jensen's eredibility "and Chettero affirmatively waived the opportunity that the district court provided him to show how it might have." [5]
1 36 First, the majority states that Trooper Jensen was only suggesting that the purpose of the exercise "was not 'specifically' to stop those from out of state." [6] "In context," he was only insisting that the subjective purpose of the exercise was to stop those carrying drugs, not generally to stop everyone from out of state.[7] But the only suggested method for how to find drugs the majority mentions is to stop high volumes of cars and to target cars registered in another state. And the testimony quoted above makes clear that the officer is saying under oath that the purpose of the exercise was to stop everyone, not to focus on out-of-state plates. The statistics would have been relevant to impeach this remark.
137 Next, the majority asserts that Mr. Chettero waived the argument because, after making it to the court, he conferred with his attorney and declined to file an additional memorandum. The memorandum would necessarily have been based on authority already before the judge, primarily State v. Lopez, after the judge had made his ruling clear. An argument is preserved if a party has presented it to the district court in such a way that the court had an opportunity to rule on it. "In determining whether the district court had an opportunity to rule on an issue, a court considers three factors: (1) whether the issue was raised in a timely fashion, (2) whether the issue was specifically raised, and (8) whether supporting evidence or relevant authority was introduced." [8] The district court here had an opportunity to rule on this issue. It was raised in a timely fashion, it was raised specifically, and it included the same authority Mr. Chettero uses on appeal. The judge gave Mr. Chettero an opportunity to file a memorandum that would have made these same arguments and he declined, possibly in order to save all parties involved time and resources on a case he already anticipated appealing. Justice Lee states that the argument in the motion citing Lopez "was not the same as the specific [argument] that the trial judge gave Chette-ro the opportunity to make" because "[ulntil the suppression hearing ... Chettero did not know what Trooper Jensen would say about the purpose underlying the traffic stop." [9] The memorandum speaks in generalities, but it clearly anticipates that the officer will fabricate a reason for the stop. And in any event, counsel coherently made the argument that he repeats on appeal at the suppression hearing, citing controlling authority, and received a ruling on it. More should not be required for preservation.
38 Next, the majority opinion states that the court's error was harmless because it also based its decision on a videotape. The video was not included in the record on appeal and "[wlhen crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." [10] But there was nothing critical about the video. Both parties agree that the *592 video does not start until "right at the point [the officer] activate[d] the overheads." The "driving pattern that [the officer] described is not on [the] video." The purpose of the suppression hearing was to determine whether the officer had reasonable suspicion to initiate the stop. Once the lights were activated, the detention was initiated. "[Alny reasonable driver would understand a flashing police light to be an order to pull over, although the Supreme Court has said that such an order would not give rise to a 'stop' unless the driver submitted to the order or was physically apprehended." [11] Here, Mr. Chettero did submit to the show of authority. The videotape showed what happened after that: Mr. Chettero pulled over and was apprehended because the officer smelled the large amount of drugs in his car. This is not relevant to the question of whether the officer had reasonable suspicion to seize Mr. Chettero when he activated his lights and initiated the stop. That the video may have offered some support to the officer's testimony is not enough to render the error that occurred at the hearing harmless.
12 "An error is harmful if it undermines our confidence in the verdict; if, minus the error, there is a sufficiently high likelihood of a different outcome."[12] When the court must decide which of two witnesses is telling the truth and has improperly excluded evidence that goes to credibility, the error is not harmless. I would reverse the trial court and remand for additional proceedings concerning the legitimacy of the stop.

. Supra 118.

. Supra TY 4-5.

. 873 P.2d 1127, 1138-39 (Utah 1994) (citation omitted).

. Supra 126.

. Supra TT 26-27.

. Supra % 27.

. Supra \ 28.

. Winward v. State, 2012 UT 85, ¶ 9, 293 P.3d 259 (internal quotation marks omitted).

. Supra 1 29 n. 9.

. Supra %32 (alteration in original) (quoting State v. Pritchett, 2003 UT 24, 113, 69 P.3d 1278).

. United States v. Swindle, 407 F.3d 562, 566 (2d Cir.2005). Swindle involved a defendant who did not yield, and therefore was not seized. It begins its analysis by discussing the importance of reasonable suspicion at initiation: "While not explicitly addressing the point from which reasonable suspicion must be measured, other courts have emphasized that a stop must be justified at its inception." Id. at 567. The Second Circuit in that case cites Feathers v. Aey, 319 F.3d 843, 848-49 (6th Cir.2003) ("'The question is whether, at the moment that they initiated the stop, the totality of the circumstances provided the officers with the reasonable suspicion required in order to detain a citizen under Terry."); United States v. Finke, 85 F.3d 1275, 1279 (7th Cir.1996) ("'Under Terry the stop must be justified at its inception ...."); United States v. Crain, 33 F.3d 480, 485 (5th Cir.1994) ("[The issue of whether an investigatory detention or traffic stop complies with the Fourth Amendment depends [in part] upon ... whether the stop was justified at its inception."); and United States v. Walker, 933 F.2d 812, 815 (10th Cir.1991) (in support of the proposition that to uphold a Terry stop, a court must determine "whether the officer's action was justified at its inception" (internal quotation marks omitted)).

. State v. Arguelles, 2003 UT 1, 194, 63 P.3d 731 (internal quotation marks omitted).