FILED
United States Court of Appeals
Tenth Circuit

**January 27, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROBERT S. WILLIAMS,

    Defendant - Appellant.

No. 19-3265
(D.C. No. 5:18-CR-40069-HLT-1)
(D. Kan.)

_____

**ORDER AND JUDGMENT***
_____

Before **HARTZ**, **KELLY**, and **HOLMES**, Circuit Judges.
_____

Defendant Robert S. Williams appeals the denial of his motion to suppress

evidence recovered from his vehicle after a traffic stop. Although a number of

potential issues are presented by the circumstances of the stop and search, the

government has simplified our task considerably by making two concessions, which

we accept without further examination: (1) all the evidence must be suppressed if the

manner of effecting the traffic stop—called a "felony car stop" or "high-risk car

stop" by the officers involved—was unconstitutional, and (2) the felony stop was

constitutional only if the officers had reasonable suspicion to believe that murder

---

* This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

suspect Justin McCoy was in the vehicle. We reverse the district court and remand with instructions to suppress the evidence because we conclude that the officers lacked reasonable suspicion to believe that McCoy was in the vehicle.

## I. BACKGROUND[1]

### A. Task Force Investigation

Beginning in the spring of 2018, several different law-enforcement agencies—the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the federal Drug Enforcement Administration (DEA), the Federal Bureau of Investigation (FBI), and the Topeka Police Department (TPD)—initiated a joint investigation of persons including McCoy who were believed to be involved in trafficking illegal narcotics and firearms. They identified several residences that they believed to be "associated" with McCoy's drug trafficking and other crimes.

On April 10, 2018, officers surveilling one of those residences, located at 3443 Southeast Indiana (the Indiana Address) in Topeka, observed Defendant arrive in a white GMC Denali SUV, enter, and then exit the residence. Agents followed him as he drove from there to 2312 Southeast Pennsylvania (the Pennsylvania Address) in Topeka—another residence associated with McCoy—where he was observed "exiting the vehicle with something in his hands and walking into the residence." R., Vol. III at 15. Defendant was not observed with McCoy on this, or any other, occasion.

---

[1] Unless otherwise specifically noted, the facts we summarize in this section are consistent with the district court's findings and undisputed by the parties on appeal.

A little more than a month later, on May 13, 2018, a woman named Patricia Sanders was shot to death in Topeka. The TPD investigated the shooting as a homicide and identified McCoy as a suspect. On the morning of May 17, Task Force Officer (TFO) Patrick Salmon and FBI Special Agent (SA) Ian Knooihuizen led a multi-agency briefing at which they discussed information pertinent to the hunt for McCoy. That evening, TFO Salmon and SA Knooihuizen were surveilling the Paradise Plaza complex, consisting of 75–100 townhome units, because a woman believed to be McCoy's girlfriend had one of the units and McCoy was known to frequent her address and to stay there. After observing Defendant's Denali exiting the complex (there was no testimony placing the vehicle specifically at the girlfriend's townhome), they notified TPD officers in the area "that the [Denali] might be a vehicle to follow and that it could be associated with Justin McCoy." R., Vol. III at 18; *see id.* at 23 (Salmon hearing testimony: "We did not know who was inside it, but we knew that vehicle was associated to that house and that it would be a good opportunity to check that vehicle to make sure that Mr. McCoy wasn't inside that vehicle.").

## B. The Stop[2]

In response to the notification, TPD Officers Barry Nelson and Brady Qualls pursued Defendant's Denali after it exited the apartment complex, watching for a

---

[2] Our recitation of the circumstances of the May 17, 2018 stop is based on testimony from the suppression hearing, as well as footage from the TPD officers' AXON bodycam videos, which were received into evidence at the hearing.

traffic violation that would provide the basis for a stop.  Shortly after beginning their pursuit, Officers Nelson and Qualls saw the driver of the Denali merge into the right lane without signaling 100 feet in advance, in apparent violation of Kan. Stat. § 8-1548.  The officers initiated a traffic stop, engaging the lights on their police cruiser.

Because they were looking for a suspected murderer, Officers Nelson and Qualls decided to conduct what is commonly known as a "felony car stop" or a "high-risk car stop."  R., Vol. III at 40–41.  In such a stop the officers, rather than approach the stopped vehicle, stay back and order the occupants of the vehicle to show their hands, exit the vehicle, and walk back to the officers' position.  It is also typical during felony stops for officers to unholster their guns.  These measures are meant to ensure the safety of everyone involved—the occupants of the vehicle, the officers, and the public.

Thus, once the Denali came to a stop, Officer Nelson ordered the driver (Defendant) to exit the vehicle and walk back to the cruiser, where he was handcuffed by Officer Qualls.  During this time, additional TPD officers arrived at the scene and took positions next to Officers Nelson and Qualls.  One of those later-arriving officers, Officer Scott McEntire, ordered the passenger (Defendant's fiancée, Tara Wharton) to exit the Denali and walk back to the police vehicles, where she too was placed in handcuffs.  By then at least five TPD officers were on the scene.  Several of them had a gun in the low-ready position, where it was "not actively pointed at anybody," but one could "draw it up quickly" if need be.  *Id.* at 89.  Once Ms. Wharton was secured, four TPD officers converged on the Denali to "clear" it

4

and ensure that there were no remaining occupants. Only then did the officers holster their guns.

During these activities one officer had smelled the odor of marijuana on Defendant and another had seen raw marijuana in the vehicle. The officers searched the vehicle, finding more illicit drugs as well as a gun in a safe.

## C. Procedural History

Defendant was indicted in the United States District Court for the District of Kansas on charges of (1) possession with intent to distribute MDMA (Ecstasy), *see* 21 U.S.C. § 841(a)(1); (2) possession of a firearm in furtherance of a drug-trafficking crime, *see* 18 U.S.C. § 924(c)(1)(A); and (3) possession of a firearm by a convicted felon, *see* 18 U.S.C § 922(g)(1). He moved to suppress the evidence obtained during the stop. Among other things, he argued that his alleged association with McCoy was insufficient to justify the stop, and that the officers' use of the aggressive felony-stop procedures exceeded the reasonable scope of a stop based on the traffic violation alone, transforming the stop into an illegal arrest and requiring suppression of the evidence.

At the suppression hearing the court heard testimony from TFO Salmon and TPD Officers Nelson, Qualls, Palumbo, and McEntire. The court also admitted into evidence bodycam footage from each of the four TPD officers. During the argument following the introduction of evidence, the following exchange occurred:

> PROSECUTOR: [T]he government understands that if you find the stop at its inception was bad, we lose everything. *If you find that the felony car stop was bad, we lose everything*.

. . . .

THE COURT: Okay. So I think you just -- so if the court was to find that the stop was bad *or the court was to find that there wasn't a basis for the high-risk execution, you agree that you lose everything*.

PROSECUTOR: Yeah, yeah, that seems inherent.

R., Vol. III at 151–52 (emphases added).

The district court denied Defendant's motion, holding that the stop was justified at its inception and that the use of force was reasonable in light of "the facts known to the TPD officers" regarding Defendant's possible association with McCoy, and thus the stop was not converted into an arrest requiring probable cause. *United States v. Williams*, No. 5:18-CR-40069-HLT, 2019 WL 1244961, at \*4 (D. Kan. March 18, 2019). In support of its ruling the court quoted and apparently relied on hearing testimony that "[f]ederal investigators had informed officers that Mr. McCoy was 'known to ride around in' the Denali and told Officer Qualls and others at a briefing that '[Defendant] was somebody that [Mr. McCoy] had possibly been staying with recently.'" *Id.* (quoting testimony from TPD Officers Palumbo and Qualls, respectively). The court also rejected various additional arguments raised by Defendant against the search of the vehicle and the safe. *See id.* at \*5–6.

Defendant then pleaded guilty to the felon-in-possession charge in exchange for dismissal of the remaining counts. The plea agreement preserved his right to appeal the court's denial of his suppression motion. He was sentenced to 26 months' imprisonment to be followed by three years' supervised release.

6

## II.     DISCUSSION

To resolve this appeal, we need consider only Defendant's argument that the felony-stop procedures employed by the TPD officers—including the use of guns and handcuffs—were unreasonable based on the information they had, and therefore the stop became a *de facto* arrest for which there was no probable cause.[3]  He contends that the information available to the officers regarding the possible association between McCoy and Defendant or his vehicle was "woefully insufficient" to support the level of force used.  Aplt. Br. at 21.  Because of the concessions by the government, we assume that the felony-stop procedures used here can be justified only if the officers had reasonable suspicion that McCoy was in the Denali at the time of the stop.

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review *de novo* the ultimate determination of reasonableness under the Fourth Amendment."  *United States v. Eckhart*, 569 F.3d 1263, 1270 (10th Cir. 2009) (internal quotation marks omitted).

In assessing whether the officers had sufficient information to support a reasonable suspicion that McCoy was in the Denali, we assume without deciding that we can consider all information known to the officers named in this opinion.  *See Felders ex rel. Smedley v. Malcolm*, 755 F.3d 870, 881 (10th Cir. 2014)

---

[3]  Mr. Williams does not challenge the district court's determination that the stop itself was justified by the observed traffic violation.

7

(summarizing the collective-knowledge doctrine, which can "allow officers as part of a common investigation to pool their collective knowledge in establishing probable cause").

The government has identified only two observations supporting a connection between McCoy and Defendant or his vehicle. First, on April 10, 2018, Defendant was seen arriving at the Indiana Address in his Denali, entering, and then exiting. Defendant was then followed to the Pennsylvania Address, where he was observed "exiting the vehicle with something in his hands and walking into the residence." R., Vol. III at 15. Both addresses were known to law enforcement as being connected to drug dealing by McCoy and his brother. TFO Salmon testified that because the two addresses were associated with trafficking, the officers "knew that individuals could not enter 2312 Pennsylvania unless [they] knew the subjects operating that -- that house for the purposes of what they were doing. So we knew that there was some association between [Defendant] and the McCoys." *Id.* at 26. Second, on the night of the stop, TFO Salmon and SA Knooihuizen observed Defendant's vehicle exiting the same townhome complex where McCoy's girlfriend lived, and which McCoy was known to frequent.[4] The agents did not see Defendant at the girlfriend's townhome in the complex, nor did they see McCoy at the complex that evening. Indeed, McCoy was *never* seen with Defendant or his vehicle, and the Government has conceded that

---

[4] Although TFO Salmon's testimony was unclear on whether he was aware at the time that Defendant himself was a resident of the same townhome complex, we will view the evidence in the government's favor and assume that he was not aware.

8

it has no evidence that McCoy or his brother was present at either the Indiana or Pennsylvania Addresses when Defendant visited them on April 10, 2018.

We recognize that the district court pointed to testimony at the suppression hearing that indicated that officers had additional information tying McCoy to Defendant and his Denali. Its opinion states: "Federal investigators had informed officers that Mr. McCoy was 'known to ride around in' the Denali and told Officer Qualls and others at a briefing that '[Defendant] was somebody that [Mr. McCoy] had possibly been staying with recently.'" *Williams*, 2019 WL 1244961, at *4. This sentence accurately reflects testimony by Officers Palumbo and Qualls at the hearing. But the government has acknowledged that the universe of information tying Defendant or the Denali to McCoy consists of the two items described in our prior paragraph. Thus, Palumbo and Qualls either misheard or misremembered what others had told them, or those speaking had misspoken. There are circumstances in which an officer's mistake of fact may still support reasonable suspicion or probable cause, *see United States v. Herrera*, 444 F.3d 1238, 1246 (10th Cir. 2006); but the government has not argued the point. And, much to its credit, it did not argue in its appellate brief or at oral argument that this part of the testimony of Palumbo and Qualls can be used to support reasonable suspicion that McCoy was in the Denali. We therefore do not consider it.

The only question that remains, then, is whether the two pieces of information discussed above sufficed to furnish reasonable suspicion that McCoy was in the Denali at the time of the stop. Reasonable suspicion requires "something more than

9

an inchoate and unparticularized suspicion or hunch." *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (internal quotation marks omitted). Law enforcement must have "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." *Id.* (internal quotation marks omitted). The existence of reasonable suspicion "does not depend upon any one factor, but on the totality of the circumstances." *Id.* (internal quotation marks omitted).

By that standard, the officers did not have reasonable suspicion to believe that McCoy was in the vehicle driven by Defendant. What they had was merely a hint that they might wish to pursue. The officers could not tell which of the 75-odd townhomes the vehicle had visited. And the only link of the vehicle to McCoy was a visit to two "business" locations of McCoy's on one occasion a month earlier, when there was no reason to believe that McCoy was at either location.

The government has not pointed to any case law supporting its view that the facts known to the officers provided reasonable suspicion to believe that McCoy was in Defendant's vehicle. What we have found in our review, however, supports our conclusion. In *United States v. Green*, 111 F.3d 515, 519–20 (7th Cir. 1997), the court said that the fact that officers had observed the defendant's car parked in front of a known fugitive's house the night before failed to provide reasonable suspicion to stop the car to look for the fugitive. In *United States v. Crawford*, 891 F.2d 680, 682 (8th Cir. 1989), the court said that the fact that a unit in an apartment building with at least six units was rented to a person arrested earlier in the day for trafficking cocaine "contributed nothing objective to the suspiciousness" of the conduct of the defendant,

10

who was observed running into and out of the building. This is not a case in which officers observed a car leaving a house or other single-family dwelling after receiving reliable information that it was occupied by a fugitive. *Cf. Ferguson v. Unicoi*, No. 2:03-CV-360, 2005 WL 2407664, at \*1, 6 (E.D. Tenn. Sept. 29, 2005), *aff'd*, 222 F. App'x 508, 510 (6th Cir. 2007) (unpublished) (reliable informant reported that fugitive was in the home; when a car pulled out of the driveway, officers followed it but were unable to tell who the occupants were because rear window was blocked; brief stop of vehicle to check for occupants was lawful).

A Second Circuit opinion is instructive. In *United States v. Swindle*, 407 F.3d 562 (2d Cir. 2005), officers assigned to an FBI task force were on patrol, looking for a fugitive wanted for dealing drugs. *See id.* at 564. They spotted "a black Pontiac Bonneville, a model of car that [the fugitive] had previously been seen 'near' but had never been known to drive." *Id.* The officers followed the car and watched as it stopped in front of a known drug house that the fugitive "had supplied in the past." *Id.* They saw a man get out of the car and enter and then exit the house, but they could not determine if he was the fugitive they were looking for. *See id.* They proceeded to follow the car and a short time later ordered it to stop. *See id.* Although other factors required denial of the motion to suppress, the appellate court said that the order to stop "was a clear abuse of police authority" because "[a]t the moment they ordered [the car] to stop, the officers had merely observed an unidentified black man drive up to the drug house in a Bonneville (a model the police associated with [the fugitive]), enter the house, leave a short while later and then

11

drive away." *Id.* at 569; *see id.* ("[The defendant's] entering a known drug house [did] not itself suggest that a crime was afoot.").

The links between McCoy and Defendant's vehicle were, if anything, even more attenuated than those in *Swindle*. McCoy was never observed "near" the Denali (or near Defendant for that matter), and the date on which Defendant was observed at the two addresses associated with McCoy came more than a month before the stop occurred. *Cf. id.* at 564 (defendant observed entering and exiting drug house associated with fugitive on the same day as the stop).

We conclude that the actions of the officers cannot be justified on the ground that there was reasonable suspicion to believe that McCoy was in Defendant's vehicle as it departed Paradise Plaza. To hold that there was such reasonable suspicion would come too close to authorizing a roadblock for inspection of all traffic leaving Paradise Plaza to check for a fugitive known to frequent the complex. We do not fault the officers for paying special attention to the recognized vehicle, and we do not foreclose the possibility that the police conduct in this case was warranted under a theory not proffered by the government. But we think the initial instinct of the officers was correct—although they could have stopped Defendant's Denali as soon as it left Paradise Plaza if they had reasonable suspicion to believe that McCoy was in it, they apparently believed that they lacked such reasonable suspicion because they decided they could not stop the vehicle until they observed a traffic violation.

12

### III. CONCLUSION

We **REVERSE** the order denying the motion to suppress and **REMAND** to the district court with instructions to **VACATE** Defendant's conviction and sentence.

Entered for the Court


Harris L Hartz
Circuit Judge