IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 10, 2012 Session

**TARIK ROBERTSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 0701869     James C. Beasley, Jr., Judge**

**No. W2011-00679-CCA-R3-PC  - Filed October 18, 2012**

The petitioner, Tarik Robertson, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief.  The petitioner was convicted of observation without consent, a Class A misdemeanor, and sentenced to eleven months and twenty-nine days, suspended to probation following service of four months in the county workhouse.  On appeal, the petitioner contends that it was error to deny him post-conviction relief because: (1) the conviction was based upon evidence obtained pursuant to an unlawful arrest; (2) there is newly discovered evidence in the case; (3) he was denied the effective assistance of counsel; and (4) there were cumulative constitutional errors in the trial process.  Following review of the record and arguments of the parties, we affirm the decision of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Randall B. Tolley, Memphis, Tennessee, for the appellant, Tarik Robertson.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Reginald Henderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background & Procedural History**

The facts underlying the petitioner's conviction, as recited by this court on direct appeal, are as follows:

Around midnight on August 17, 2006, [the victim] was preparing to take a bath when she thought she saw a "blurred vision in the window." [She] ran out of the bathroom to tell her husband, but later returned to the bathroom to continue her bath. [She] testified that while she was sitting naked in the tub, she saw [the petitioner's] face "matted straight to the glass window" for one to two minutes. [She] then "started screaming and hollering" before she ran out of the bathroom and called the police. She testified that she had never seen [the petitioner] before.

[The victim] testified that the police arrived roughly one minute after she called them. She met the officers outside of her home, and described [the petitioner] as wearing a white shirt with a "low" haircut and big eyes. After [the petitioner] was detained, [the victim] identified him as the individual who looked into her window.

[The victim] testified that her bathroom window is at eye level if standing in the tub. The window shares the same wall as the tub. She described the window as stained glass with a flower design in the middle. The glass has different colors, including green, pink, and purple. [She] noted, "Some parts of it is clear and some parts of it is stained. It's frosted." From the inside looking out, she said "you can see straight through it." [The victim] testified that she was not wearing glasses while sitting in the tub; however, she began wearing glasses about three weeks before the trial.

[The victim] testified that three months after the incident, she was approached by [the petitioner] at a fast-food restaurant. She was about to order at the drive-thru when [the petitioner] pulled his vehicle to the side of her vehicle. [She] said that [the petitioner] then offered her seven hundred dollars to "go before the media and clear his name." [She] later reported these events to the police.

Officer Marco Yzaguirre of the Shelby County Sheriff's Department testified that he and Officer Michael Kraemer responded to a "prowler call" from [the victim's] home. Officer Yzaguirre confirmed that they were less than one minute from [the victim's] home when he received the call from the dispatcher. Upon arrival Officer Yzaguirre observed that [the victim] "came out of the house, screaming." Officer Yzaguirre testified that "she kept yelling, 'He's in the back, he's in the back.'" Officer Yzaguirre ran to the east side of [the victim's] home where he saw a black man wearing a white shirt and matching the description provided by [the victim]. Officer Yzaguirre said

[the petitioner] also wore jean shorts and tennis shoes. After [the petitioner] was detained, [the victim] identified [the petitioner] as the prowler. Officer Yzaguirre testified that [the petitioner] repeatedly said he was a fireman, denied that he was a prowler, and explained that he was jogging. Officer Yzaguirre said [the petitioner] asked the officers to issue him a misdemeanor citation because they "are in the same business."

Officer Michael Kraemer of the Shelby County's Sheriff's Department testified that he assisted Officer Yzaguirre in responding to the prowler call. Office Kraemer stated that after [the petitioner] was detained, he went to investigate the bathroom window. He found a partial shoe print on the air conditioner that sits under the bathroom window. Officer Kraemer examined the sole of [the petitioner's] shoe and determined that it matched the print on the air conditioner. The print on the air conditioner was not preserved and no photographs were taken. Later, at trial, Officer Yzaguirre testified that the arrest ticket did not mention the shoe print.

Officer Terry Williams of the Shelby County Sheriff's Department testified that [the victim] filed an intimidation report on March 8, 2007. Although the report showed that [the petitioner] approached [the victim] at the drive-thru of a fast-food restaurant, it did not state that [the petitioner] offered [her] seven hundred dollars in an effort to clear his name. Officer Williams testified, however, that [the victim] told him that she was offered the money. He did not include it in the report upon the instruction of his field commander.

[The petitioner] testified that before midnight on August 16, 2006, he left his home after an argument with his wife. He wore a white polo shirt and white tennis shoes. [The petitioner] stated that he lives in the same area as [the victim]. He was walking to a gas station to purchase a drink when he realized that his wallet was at home. On his return home, [the petitioner] testified that he walked past [the victim's] house, which he thought was vacant. He was then grabbed by a police officer who called him a prowler. [The petitioner] denied looking through [the victim's] bathroom window. He said he did not tell the officers that he was a fireman, and he denied asking to receive a lenient misdemeanor citation. [The petitioner] also denied that he later approached [the victim] at a fast-food restaurant. He claimed one of the officers told [the victim] what [the petitioner] was wearing before she identified him to the police.

*State v. Tarik Robertson*, No. W2008-01592-CCA-R3-CD (Tenn. Crim. App., at Jackson,

Nov. 10, 2009), *perm. app. denied*, (Tenn., Apr. 14, 2010).

Based upon this evidence, the petitioner was convicted by a Shelby County jury of observation without consent and was sentenced to eleven months and twenty-nine days, four months of which was to be served in the county workhouse. *Id*. The petitioner filed a direct appeal to this court challenging: (1) the sufficiency of the evidence; (2) that the trial court erred in its role as the thirteenth juror; (3) that the State committed prosecutorial misconduct in closing arguments; and (4) that the trial court erred in determining the sentence length and manner of service. This court denied relief, and the Tennessee Supreme Court denied the petitioner's application to appeal. *Id*.

Thereafter, the petitioner, through counsel, filed the instant petition for post-conviction relief, as well as a later-filed amended petition, alleging multiple grounds for relief. A hearing was held at which multiple witnesses were called to testify. The first witness was Lieutenant Reginald Hubbard who responded to the scene of the crime and served as the supervisor of Officers Kraemer, Yzaguirre, Boyd, and Curtis, who all arrived there prior to him. This was Lieutenant Hubbard's first time to testify in this case, as he was not called at trial or the preliminary hearing. Lieutenant Hubbard stated that he was only able to recall "portions" of the evening, but did indicate that he recalled that when he arrived, the petitioner was already in the rear of the squad car. He also recalled the victim's identification of the petitioner and, further, that she was hysterical at the time. Lieutenant Hubbard was not involved in any preservation of the evidence at the scene. He testified that he understood that the General Investigative Bureau was to be called to come preserve the evidence. It was later determined that, although they were contacted, the bureau elected not to come to the scene.

Lieutenant Hubbard testified that he did observe a footprint on the air conditioning unit at the rear of the home, noting that the footprint was "on the very top of the unit." He identified several pictures of the home and air conditioning unit, taken by post-conviction counsel, as representative of those things on the night of the incident. He stated that, because of the placement of the bathroom window, it was assumed that the perpetrator had to stand on something in order to see inside. Because of the footprint, the assumption was made that he stood upon the air conditioning unit to accomplish his nefarious purpose. Lieutenant Hubbard did acknowledge that the air conditioning unit was not directly beneath the window, but stated that "once he's on top of the unit he can lean over and be able to look inside." He acknowledged that the bathroom window "appears to be a stained-glass window," although some portions were clear. Lieutenant Hubbard did not enter the home and personally determine if a person would be able to see through the window from the inside.

-4-

The next witness to testify was the petitioner himself. With regard to his activities on the night of the crime, the petitioner testified that he left his nearby home after getting into an argument with his wife. The petitioner stated that he left on foot and proceeded to walk around the neighborhood "to clear [his] head out." He testified that he walked to an Exxon station to get something to drink, but he realized that he did not have his wallet, money, or identification with him. As the petitioner began to walk home, he saw squad cars in the street with blue lights flashing. The petitioner indicated that he walked in that direction, as it was the way to his home, and stopped to talked with Officer Boyd, who was standing outside his vehicle. The petitioner testified that Officer Kraemer then grabbed him, threw him across the hood of the car, and placed his left forearm at the back of his neck. According to the petitioner, Officer Kraemer accused him of being a "prowler," which the petitioner said he denied. The petitioner also elaborated that, at this point, Officer Boyd turned away from him and returned to his patrol car, deactivating the lights and video-camera on the car. He then claimed that the officers handcuffed him, and Officer Kraemer "g[a]ve me" to Officer Yzaguirre before heading back around the home. The petitioner claimed that he could hear Officer Kraemer returning with the victim, and, as they walked toward him, describing to her what the petitioner was wearing. With regard to a description, the petitioner disputed the testimony Officers Kraemer and Yzagguire given at trial that a description of the perpetrator was relayed to them by the 911 operator. He also pointed out that their descriptions, which were allegedly relayed to them, were not consistent with each other, and further, that a transcript of the 911 call reflected that no description was given at all. The petitioner complained neither the tape of the call nor a transcript of it were introduced at trial to use in cross-examination of the officers.

The petitioner indicated that during the pendency of the underlying proceedings, he had been represented by two separate attorneys, the first in general sessions, the second in the trial court. The petitioner testified that general sessions counsel apparently waived a preliminary hearing in the matter, without the petitioner's knowledge or consent. The petitioner understood that he stood charged with a misdemeanor offense, but he was not advised by general sessions counsel that for a proper misdemeanor arrest, the offense had to occur in the officer's presence. No attack was made on the arrest at the general sessions level.

The petitioner related that, even after trial counsel was hired, no motion to suppress his purportedly unlawful arrest was filed. He also stated that no motion to suppress was filed based upon an overly suggestive line-up and identification, *i.e.*, the petitioner was handcuffed and Officer Kraemer was describing what the petitioner was wearing to the victim. The petitioner also contended that Lieutenant Hubbard should have been called to testify at trial, and faulted trial counsel for the omission. He also testified that he was dissatisfied with trial counsel's questioning of the victim with regard to the amount of time she had worn glasses.

The petitioner did acknowledge that trial counsel had discussed the trial with him and addressed questions that he had. He also acknowledged that he and trial counsel discussed his right to testify, and he elected to avail himself of that right. The petitioner acknowledged that attorneys are often called to make strategic decisions in cases, but he denied that introduction of the 911 transcript would have hurt his case, despite the comment by the victim that she could positively identify the prowler's face.

The final, and only, witness called by the State was trial counsel. He recalled that he received and reviewed discovery with the petitioner in this case, and, although he was unable to recall specifically what was included, he did not recall any surprises at trial. Trial counsel indicated that he had discussed possible settlement options with the petitioner, but the petitioner was adamant he was innocent and refused consider a plea. The case went to trial, and the petitioner elected to testify and give his version of events. Prior to trial, trial counsel was aware that the victim had identified the petitioner at the crime scene. Trial counsel felt that identification was the major issue in the case and believed there was a valid question on whether someone could be identified through a stained glass window. He elaborated that, in support of that theory, he had presented a videotaped interview given by the victim to a local television station, which depicted the actual window.

Trial counsel did not specifically recall photographs being introduced of the crime scene at trial. When shown pictures taken of the victim's backyard and air conditioning unit, taken in preparation for post-conviction, trial counsel indicated he was "cau[ght] . . . off guard because it doesn't look like [the air conditioning unit is] under the window." He opined that from these photographs, it did not appear possible that someone could stand on the unit and look into the bathroom through the window. However, when questioned, he indicated that he did not believe that there was a question that someone was looking in the victim's window, the only issue was whether she had identified the correct person.

Trial counsel testified that he was aware that the petitioner was charged with a Class A misdemeanor and that the offense did not occur in an officer's presence. However, he did not file a motion to suppress based upon grounds that arrests for misdemeanors without a warrant must occur in the presence of an officer. Trial counsel was also aware of the on-scene identification by the victim and, further, that the footprint had never been specifically matched to the petitioner's shoe.

With regard to testimony at trial regarding a description of the perpetrator, trial counsel was only able to recall something about the perpetrator wearing a light-colored or white shirt. Trial counsel verified that he did not introduce the 911 tape or transcript at trial and, frankly, could not recall if mention was made of a description on the tape, although he acknowledged there was not one contained in the transcript he was given for refreshment at

the hearing. However, he testified that he did not introduce the tape because he did not want to reinforce the victim's identification at the scene, as the tape contained language that she could positively identify her prowler.

After hearing the evidence presented, the post-conviction court denied relief. The petitioner has timely appealed that determination.

**Analysis**

On appeal, the petitioner has challenged the post-conviction court's denial of his petition for post-conviction relief. He specifically delineates four issues for our review: (1) whether the conviction was based on evidence obtained pursuant to an unlawful arrest; (2) whether there is newly discovered evidence in the case; (3) whether the petitioner was denied the effective assistance of counsel; and (4) whether there were cumulative constitutional errors in the trial process.

**I. Unlawful Arrest**

First, the petitioner contends that his conviction was based on evidence obtained pursuant to an unlawful arrest. He asserts that all the evidence obtained from the scene, *i.e.*, the identification and testimony regarding the shoe print, was "undisputabl[y]" obtained after an illegal arrest. He bases his argument on the fact that an officer may not arrest an individual for a misdemeanor offense without a warrant, except in enumerated situations, unless the offense was committed in the officer's presence. *See* T.C.A. § 40-7-103 (2010). While we understand the petitioner's contention, we conclude that the issue, as a freestanding one, is waived for failure to present it earlier, such as on direct appeal. *See* T.C.A. § 40-30-106(g) (stating that a ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented). While we do not review the issue standing alone, we will, nonetheless, consider it under the umbrella of ineffective of assistance of counsel for failure to challenge the arrest with a motion to suppress, as it was also raised by the petitioner in that manner.

**II. Newly Discovered Evidence**

Next, the petitioner contends that there is newly discovered evidence in the case which would have affected the outcome of the proceeding. Specifically, he refers to photographs of the crime scene which were taken in preparation for post-conviction proceedings. He contends that the photographs establish that the crime could not have been committed pursuant to the State's trial theory, based upon the placement of the air conditioner unit in

relation to the bathroom window.

We agree with the State that a claim of newly discovered evidence, standing alone, does not constitute a proper ground for post-conviction relief. For such a claim to be cognizable in a post-conviction proceeding, it must implicate a constitutional right. A proffer of newly discovered evidence generally amounts to no more than a request to relitigate the sufficiency of the evidence at trial, which a post-conviction proceeding may not be employed to do. As such, we will not consider this issue standing alone. However, as noted with regard to the petitioner's illegal arrest argument, the issue may be considered pursuant to an ineffective assistance of counsel claim. As the issue was somewhat argued under that auspice at the hearing and is also mentioned in the petitioner's brief, we will consider the issue in that manner.

## III. Ineffective Assistance of Counsel

The petitioner contends that the post-conviction court erred in denying his petition because trial counsel was ineffective in his representation at trial. Specifically, he faults trial counsel for: (1) failing to call Lieutenant Hubbard; (2) failing to introduce crime scene photographs; (3) failing to file a motion to suppress evidence obtained pursuant to an unlawful arrest; (4) failing to challenge the overly suggestive identification of the petitioner by the victim; and (5) failing to introduce the 911 tape to counter the officers' testimony that the victim had given a description of the perpetrator to the 911 dispatcher.

In order to obtain post-conviction relief, a petitioner must prove that his or her conviction or sentence is void or voidable because of the abridgement of a right guaranteed by the United States Constitution or the Tennessee Constitution. T.C.A. § 40-30-103; *Howell v. State*, 151 S.W.3d 450, 460 (Tenn. 2004). A post-conviction petitioner must prove allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). In an appeal of a court's decision resolving a petition for post-conviction relief, the court's findings of fact "will not be disturbed unless the evidence contained in the record preponderates against them." *Frazier v. State*, 303 S.W.3d 674, 679 (Tenn. 2010).

A criminal defendant has a right to "reasonably effective" assistance of counsel under both the Sixth Amendment to the United States Constitution and Article I, Section 9, of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to effective assistance of counsel is inherent in these provisions. *Strickland v. Washington*, 466

U.S. 668, 685-86 (1984); *Dellinger*, 279 S.W.3d at 293. To prove ineffective assistance of counsel, a petitioner must prove both deficient performance and prejudice to the defense. *Strickland*, 466 U.S. at 687-88. Failure to satisfy either prong results in the denial of relief. *Id.* at 697.

For deficient performance, the petitioner must show that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms, despite a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687-89. "In other words, the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The petitioner must prove that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. When reviewing trial counsel's performance for deficiency, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689). However, "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Prejudice in turn requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In *Strickland*, the Supreme Court noted that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691. The court clarified that prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

A claim of ineffective assistance of counsel raises a mixed question of law and fact. *Burns*, 6 S.W.3d at 461; *Grindstaff*, 297 S.W.3d at 216. Consequently, this court reviews the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates against the trial court's factual findings. *Grindstaff*, 297 S.W.3d at 216. But the trial court's conclusions of law on the claim are reviewed under a purely de novo

standard with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001).

### a. Failure to Call Lieutenant Hubbard

In a single sentence, the petitioner makes the assertion that "[t]rial counsel was ineffective in not calling [Lieutenant] Hubbard, who was in charge of the scene . . . ." There is no further mention of this alleged error anywhere else in the argument section of the brief- no law is cited, no contention of what benefit calling him would have been, and no supporting argument is made.[1] The issue is, therefore, waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.) Although Lieutenant Hubbard was called to testify at the post-conviction hearing, the issue was not specifically argued before the court, and no ruling was made on the issue. Without more, review is simply not possible. From what we do glean from Lieutenant Hubbard's testimony at the hearing, we are unable to conclude that it would have affected the outcome of the trial had he been called to testify at the trial. He was not the first officer on the scene, was not actively involved in the arrest, and his testimony at the hearing offered little, if any, new information. No relief is warranted.

### b. Failure to Introduce Crime Scene Photographs

The petitioner also claims trial counsel was ineffective for failing to introduce photographs of the crime scene, which would have illuminated the impossibility of the crime being committed as it was portrayed by the State. In other words, photographs would have shown that it was physically impossible for a perpetrator to stand on the air conditioning unit and look in the bathroom window. He relies upon trial counsel's testimony that, had pictures been admitted, the outcome of the proceedings might have been affected.

In denying relief on this issue, the post-conviction court, in its written order, stated:

> . . . The only proof presented appeared to be photos that showed that an air conditioner unit was close to the window in question but not underneath it.

---

[1]We glean that the petitioner might be making this assertion based upon Lieutenant Hubbard's post-conviction testimony that the petitioner was identified by the victim after he was handcuffed and placed in the patrol car. It appears he attempts to use that testimony to buttress his motion to suppress the identification argument. However, he does not support this contention with citation. Moreover, Lieutenant Hubbard's testimony stands in contradiction to that given by other witnesses. Regardless, the issue of suppression of the identification is addressed below.

Arguably if someone stood on the air conditioner unit they could not look directly into the window. There was a footprint on the air conditioner unit which was alleged to match the pattern of the petitioner's shoe. The print was not preserved for presentation at trial. There was no proof that the print actually belonged to the petitioner but it was suggested that the print matched the pattern. Although, it appears to the Court that it would require some physical gymnastics to stand on the air conditioner and look into the window without something else to stand on, the question in the trial was not that the crime did not occur but rather the identity of the perpetrator. Therefore, this court fails to see how the photos of the air conditioner unit and its location would have made any difference in the verdict. There was never a question of how the perpetrator peeked in the window. The only question was who was the perpetrator. The victim made a positive identification of the petitioner on the scene. The petitioner testified as to his actions and the victim testified as to her ability to make an identification through a stained glass window. The jury heard both testimonies and credited the State's witness. This Court finds there is no newly discovered evidence and likewise fails to find any evidence which was not disclosed to petitioner.

We agree with the State that these photographs do not fall within the normal scope of "newly discovered evidence," as it is generally applied. Moreover, as we may only review this issue within the scope of ineffective assistance of counsel, the only issue before us now is whether trial counsel was ineffective for failing to introduce photographs of the crime scene. After review, we conclude that he was not.

As noted by the trial court, the issue at trial was identification. It was not contested that the crime itself did occur, as the victim specifically testified that she saw a face looking in her window. The jury heard that testimony and chose to accredit it in assuming that the event had occurred. The victim did not testify as to how the crime was committed, *i.e.*, that the perpetrator stood on the air conditioning unit. Granted, the State asserted that as its theory of the case based upon the presence of the footprint. Regardless, the photographs do not conclusively establish that the petitioner could not have committed the crime in that matter. As noted by the post-conviction court, while it might have required "some physical gymnastics" to stand on the unit and peer through the window, it is not impossible that the petitioner is capable of performing such feats. The photographs do not negate that possibility. Moreover, testimony from the victim in fact supported this, as she stated that the face she saw was in the corner of the window, not peering squarely inside. Even if it is assumed that the air conditioning unit was not used to perpetrate this offense, it still does not foreclose other methods. The victim saw a face outside her window, and she identified that face was the petitioner's. Thus, we cannot conclude that photographs would have affected

-11-

the outcome of the trial, precluding the petitioner from relief.

### c. Failure to File a Motion to Suppress

The next issue for review is whether trial counsel was ineffective for failing to file a motion to suppress evidence based upon an illegal arrest. In order to establish this claim, the petitioner must show that trial counsel would have been successful in the endeavor to have the evidence quashed. *See State v. Hellard*, 629 S.W.2d 4, 11 (Tenn. 1982).

As previously noted, the petitioner bases his argument on Tennessee Code Annotated section 40-7-103, which provides that, with some exceptions not applicable here, Tennessee law does not permit an officer to make a warrantless arrest for a misdemeanor not committed in the officer's presence. While evidence arising from such an arrest should be suppressed, *only* evidence obtained as the result of such an unlawful should be suppressed. *State v. Jashua Shannon Sides*, E2000-01422-CCA-R3-CD (Tenn. Crim. App., at Knoxville, May 16, 2001) (citing *State v. Clark*, 844 S.W.2d 597, 600 (Tenn. 1992)). Evidence which is developed prior to the unlawful arrest need not be suppressed in the prosecution. *Id*.

In denying relief on this issue, the post-conviction court stated as follows:

> . . . Although the petitioner claims his arrest was unlawful because it was a misdemeanor and was not committed in the officer's presence he failed to state what evidence should have been suppressed by his trial counsel. It appears to the Court that the crime occurred and the victim called the police. Once the police arrived on the scene and obtained a description of the alleged perpetrator they began searching the neighborhood. The petitioner was in the immediate area and matched the description given by the victim. He was brought to the scene and the victim made a positive identification of the petitioner. He was then arrested and charged with the above offense. No proof was presented that any evidence was presented or recovered as a result of his arrest. There was probable cause to detain the petitioner and return him to the scene to determine what if any crime occurred and if the petitioner was the perpetrator. The identification was made before the arrest, therefore there is nothing to suppress.

According to the petitioner, "all evidence obtained from the scene: the identification, the testimony regarding the shoe print, etc. was undisputabl[y] obtained after an illegal arrest." The State, as did the post-conviction court, disagrees. The State contends that, although detained and handcuffed at the time of the identification by the victim, the petitioner was not "under arrest." If this is correct, then trial counsel cannot be faulted for failing to

file a motion to suppress the identification, as it would have been unsuccessful.[2] As such, the issue before us turns on when the petitioner was effectively "under arrest."

Whether an arrest has occurred is not always clear; it is a fact-intensive inquiry. *State v. Ingram*, 331 S.W.3d 746, 757 (Tenn. 2011). The ultimate conclusion of whether the facts establish that a person was under custodial arrest is one of law. *State v. Daniel*, 12 S.W.3d 420, 423-24 (Tenn. 2000) (stating "the trial court's conclusion that a seizure did not occur is a conclusion of law derived from an application of the law to the undisputed facts of this case"); *State v. Nidiffer*, 173 S.W.3d 62, 64 (Tenn. Crim. App. 2004) (reviewing issue of whether defendant was under arrest when he refused to consent to a blood alcohol test under de novo standard). In Tennessee, the definition of "arrest" is well-established; it is "'the taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest.'" *State v. Crutcher*, 989 S.W.2d 295, 301 (Tenn. 1999) (quoting *West v. State*, 425 S.W.2d 602, 605 (Tenn. 1968)). Although "[a]n arrest may be affected without formal words or a station house booking . . . there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer." *Id*. at 301-02 (citing 5 Am. Jur. 2d Arrest § 2 (1995)).

While not dispositive, an officer's telling a defendant he is under arrest is a substantive factor to consider when determining whether an arrest has occurred. *Nidiffer*, 173 S.W.3d at 66. Still another factor to be considered in determining whether an arrest has occurred is whether a "reasonable person" would have concluded that he was under arrest. *Id*. at 65-66.

Based upon the testimony of the officers at trial and the facts recited on direct appeal, it is apparent that the petitioner was placed in handcuffs while he was in the backyard of the residence. However, it is also abundantly clear that he was informed by officers that he was being handcuffed and patted down for weapons solely for security and officer protection purposes because he had no identification and was not cooperative. As the petitioner refused to identify himself, it was reasonable on the part of the officers to restrain him, as he matched the description of a suspect in the neighborhood, had no valid purpose for being there, and could have caused harm. The petitioner was never informed that he was under arrest, and

---

[2]With regard to a motion to suppress the footprint testimony, trial counsel might have been successful, as the record is somewhat ambiguous as to when the actual formal arrest was made, although it is clear it was after the identification by the victim. However, as the footprint was never preserved or conclusively linked to the petitioner, such evidence could not have affected the outcome of the trial. As such, the petitioner fails on the prejudice prong of ineffective assistance of counsel.

no *Miranda* warnings were given. He was simply being detained to allow for a "show up" identification because he met the description of the perpetrator and was found at the scene minutes after the victim's call to 911. *See Terry v. Ohio*, 392 U.S. 1, 25-31 (1968). He was taken to the front of the home, still handcuffed, and identification was made by the victim.

The question then becomes, does the act of placing a suspect in handcuffs necessarily equate to arrest. After research, we are unable to locate any case explicitly addressing this issue, nor is one referenced by the State or the petitioner. However, as the State points out, other jurisdictions, both state and federal, have concluded that handcuffing does not necessarily equate to arrest, especially when undertaken in the interest of officer security during a *Terry* stop with accompanying explanations that the suspect is not under arrest. *See United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992) ("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a *Terry* stop."); *United States v. Hastamorir*, 881 F.2d 1551, 1557 (11th Cir. 1989) ("The handcuffing of Hastamorir constituted a *Terry* stop, and was a reasonable action designed to provide for the safety of the agents"); *United States v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981) (Handcuffing a suspect does not necessarily dictate a finding of custody; strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody); *United States v. Glenna*, 878 F.2d 967 (7th Cir. 1989) (Ruling that the use of handcuffs did not transform an investigatory stop to an arrest when the officer's safety was at risk); *Cardona v. Connolly*, 361 F. Supp.2d 25, 32 (D. Conn. 2005) (Suspect not under arrest where officer handcuffed her and led her to police vehicle for security while awaiting backup); *Bolden v. State*, 278 Ga. 459, 462 n.3 (2004) (Defendant transported to police station in handcuffs as safety measure was not under arrest); *State v. Walsh*, 495 N.W.2d 602, 605 (Minn. 1993) (Suspect, although handcuffed, was not under arrest); *Turner v. State*, 252 S.W.3d 571, 580 (Tex. Ct. App. 2008) (Defendant was not under arrest where officer told defendant before putting him in the vehicle he was going to handcuff him, for officer safety and not because he was under arrest).

On these facts, we must agree with the post-conviction court that the petitioner was not under arrest at the time the identification was made by the victim.[3] We find the reasoning of the above cited jurisdictions persuasive in their conclusions that handcuffing does not automatically equate to an arrest. Additionally, on direct appeal, this court also characterized the petitioner as being detained, as opposed to under arrest, prior to the identification. *Robertson*, No. W2008-01592-CCA-R3-CD. In this case, the petitioner was merely being detained in order to allow the investigation to be completed. He was specifically informed

---

[3]In the interest of completeness of review and finality, we note that this conclusion would be the same even had Lieutenant Hubbard testified that he recalled the identification occurring after the petitioner was placed in the police car.

that he was being placed in handcuffs for safety reasons. Although no testimony stated that the petitioner was specifically told that he was not under arrest, logically, if he was told that he was being handcuffed for another, separate purpose, he would have implicitly been informed of such.

Again, nothing in the record before us preponderates against the post-conviction court's finding that a motion to suppress in this case would have been unsuccessful. As noted, trial counsel cannot be faulted for failing to file a futile motion. Thus, the petitioner is not entitled to relief.

### d. Failure to Challenge an Overly Suggestive Identification

The petitioner also challenges trial counsel's failure to challenge what he describes as an "overly suggestive" identification. However, he bases his challenge on his own testimony as to the facts of the case, which is not consistent with the testimony of the police officers at trial. The petitioner stated that Officer Kraemer escorted the petitioner to the area where he was detained, and, as he was doing so, he described what the petitioner was wearing. Additionally, he testified that the victim "identified me when Officer Yzaguirre had me handcuffed in the back and had a flashlight in my face on the side of her house."

In *Neil v. Biggers*, the United States Supreme Court established a two-part test to determine the validity of a pretrial identification. 409 U.S. 18, 199-200 (1971). First, the court must determine whether the procedure used to obtain the identification was unduly suggestive. *Id*. Then, if the identification was unduly suggestive, the court must determine, based on the totality of the circumstances, whether the identification is nevertheless reliable. *Id*. Tennessee law proscribes so-called one-on-one "showups" unless the showup occurs as an on-the-scene investigatory procedure shortly after the commission of the crime. *State v. Thomas*, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989).

As noted, the police officers' version of the identification stands in contrast to the story given by the petitioner. Clearly, a credibility determination was made by the lower court, which favored the officers. As has been reiterated on multiple occasions, it is not the function or province of this court to reweigh or re-evaluate credibility determinations made by the trier of fact. *See State v. Evans*, 108 S.W.3d 231, 234 (Tenn. 2003). As such, we are left with the testimony of the officers, which was that Officer Yzaguirre handcuffed the petitioner in the rear of the home, and he was then escorted to the front, where he was identified by the victim. No mention is made of any "hints" given by the officers to aid the victim with her identification.

On this record, it is clear that the victim identified the petitioner at the scene of the

crime, within minutes of its occurrence. This court has routinely countenanced this procedure of detaining a suspect immediately following a crime to allow time for the victim to identify the perpetrator. *See State v. Tony Ray Billings*, No. M2010-00624-CCA-R3-CD (Tenn. Crim. App., at Nashville, Apr. 14, 2011). We are simply unable to conclude that this identification was in any way "overly suggestive." As such, the petitioner has failed to carry his burden to show an entitlement to relief.

### e. Failure to Introduce the 911 Tape

Lastly, the petitioner finds fault with trial counsel for not introducing the 911 tape or a transcript of the call. According to the petitioner, the tape contains no description of the perpetrator given by the victim to the dispatcher. The petitioner urges that trial counsel should have used the tape to cross-examine police officers and the victim, who all indicated that a description had been relayed. Officers testified that they were provided a "description of a black man, low haircut, big eyes, a white shirt with a collar and a gold chain." He contends this "exculpatory evidence" should have been utilized by trial counsel.

At the post-conviction hearing, trial counsel did review the transcript and agreed that no description was mentioned. However, trial counsel testified that he made a strategic decision not to introduce the 911 tape because of concern that the tape contained a statement by the victim that she was certain of her ability to identify the prowler. Trial counsel was concerned that this would only heighten the weight the jury gave her later identification of the petitioner at the scene. We may not second-guess a valid tactical decision. *See Adkins*, 911 S.W.2d at 347 (A "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceeding.").

Moreover, we take issue with the petitioner's characterization of this evidence as "exculpatory," which would be evidence tending to clear the petitioner of guilt. That is not the case here. The tape did not contain a description which excluded the petitioner as a suspect by providing a description which he did not fit; rather, it was simply silent. Additionally, trial counsel did cross-examine the officers regarding the description allegedly given and attempted to highlight their varied responses. The petitioner has simply failed to show that introduction of the 911 tape would have in any way affected the outcome of his trial.

### IV. Cumulative Error

Finally, the petitioner contends that the constitutional errors in this case were cumulative and highly prejudicial, stating that he should have been granted relief on that

basis. He contends that this "was a very 'close case', riddled with unprofessional and unconstitutional errors." However, the petitioner again fails to cite to any authority to support his argument; thus, technically waiving his argument. *See* Tenn. Ct. Crim. App. R. 10(b).

Regardless, the petitioner's argument would fail. A showing of cumulative error necessarily demands a showing of multiple errors in the underlying proceeding. *See Nichols v. State*, 90 S.W.3d 576, 607 (Tenn. 2002). Having previously determined that none of the above arguments were meritorious, we are unable to conclude that the petitioner is entitled to relief on this basis.

## CONCLUSION

Based upon the foregoing, the denial of post-conviction relief is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE